## ADAMS *v.* THE STATE.

CRIMINAL LAW.—*Involuntary Manslaughter.*— *Murder.*—On the separate trial of a defendant indicted jointly with B. and others for murder, the evidence established substantially, that an altercation had taken place between the deceased and B., during the evening on which the former was killed ; that the deceased, having left the parties indicted, got into an altercation with another, displaying a pistol and threatening to shoot any one interfering with him ; that subsequently the parties indicted came up to the deceased, who was immediately struck by B. ; that, though the deceased denied having a pistol, the defendant and the other parties indicted, at the request of B., undertook to assist him in disarming the deceased ; and that, during the scuffle, and immediately upon B.'s exclaiming that he had obtained the pistol, it was discharged, killing the deceased.

*Held,* that B. was guilty, if at all, of involuntary manslaughter only.

*Held,* also, that the defendant was not guilty.

SAME.—*Instruction.—Failure to Instruct Fully.*—The court, after reciting the statutory definition of manslaughter, instructed the jury trying such cause, "that, in manslaughter and in murder, there is the common element of intent to kill. The distinction is, that in murder malice, either express or implied, is present, while in manslaughter it is absent. * The intention to kill must grow out of hot blood, in order to reduce an unlawful homicide to the grade of manslaughter."

*Held,* that, in the absence of a request by the defendant, and a refusal by the court, to instruct as to involuntary manslaughter, he can not complain of the instruction.

SAME.— *Voluntary and Involuntary Manslaughter Distinguished.*—In voluntary manslaughter the killing is intentional, while in involuntary manslaughter the killing is unintentional, but in the commission of an unlawful act.

SAME.—One indicted for voluntary manslaughter can not be convicted on proof that he is guilty of involuntary manslaughter.

SAME.—*Aider or Abettor.*—There can be no aider or abettor in the commission of involuntary manslaughter.

From the Owen Circuit Court.

*W. M. Franklin,* for appellant.

*T. W. Woollen,* Attorney General, *S. O. Pickens,* Prosecuting Attorney, and *I. H. Fowler,* for the State.

HOWK, J.—At the September term, 1878, of the Owen Circuit Court, an indictment was duly returned by the grand jury of said court and term, wherein it was charged, in substance, that, " at the county of Owen and State of Indiana, on the 21st day of September, 1878, one James Patterson, Charles Patterson, William Anderson and John Byrant did then and there unlawfully, in and upon the body of one Anthony White, a human being, feloniously, purposely and with premeditated malice, make an assault, and with a pistol loaded with gunpowder and leaden bullet, which they, the said James Patterson, Charles Patterson, William Adams and John Bryant, in their hands then and there had and held, him, the said Anthony White, feloniously, purposely and with premeditated malice, did shoot, strike and mortally wound, from which said wound, so inflicted as aforesaid, the said White

then and there instantly did die, and so the grand jurors aforesaid, upon their oath as aforesaid, do charge that the said James Patterson, Charles Patterson, William Adams and John Bryant, him, the said White, by the means and in the manner aforesaid, then and there, feloniously, purposely and with premeditated malice, did kill and murder, contrary to the form of the statute," etc.

The defendants named in said indictment jointly moved the court to quash it, which motion was overruled, and they jointly excepted. Upon arraignment, they entered a joint plea of not guilty to the indictment, and they then elected to be tried thereon separately and severally.

The issues joined as to the appellant, William Adams, were submitted to a jury for trial, and a verdict was returned, finding him guilty of manslaughter, and assessing his punishment at twelve years in the state-prison. His motion for a new trial was overruled by the court, and his exception was entered to this decision, and judgment was rendered on the verdict.

In this court the appellant has assigned, as error, the decision of the circuit court in overruling his motion for a new trial. In this motion the following causes were assigned for such new trial, to wit:

" 1st. That the verdict of the jury is contrary to law;

" 2d. That the verdict is contrary to the evidence;

" 3d. Error of the court in giving instructions 1 to 23 inclusive, and each of them; and,

" 4th. Error of the court in refusing to give instructions asked by the defendant, numbers 1 to 3 inclusive, and each of them."

We may properly remark in the outset, that no point is made in this court upon the fact, apparent in the record, that the name of the appellant is given in the charging part of the indictment, as William Anderson, instead of

William Adams. This latter name is the one in which he pleaded and was tried, and the name of William Anderson, where it appears, is probably a clerical error in transcribing the indictment into the record, and we will so consider it.

We give, from the brief of the appellant's counsel, the following statement of the facts attending the killing of Anthony White, at Fredonia, Owen county, Indiana, on the night of September 21st, 1878, upon which the indictment against the appellant and his codefendants, in this case, was predicated, which statement of facts the attorneys for the State admit to be substantially correct:

" The circumstances of the killing were about these: There was a public political meeting in the town that night, and also a religious meeting at a church, about a quarter of a mile from the political meeting. The deceased came to the town late that evening, between sundown and dark, considerably intoxicated. The defendant, with the others included in the indictment, came there about dark, and were in a saloon, under where the political meeting was being held, and had all been drinking some. About 7 or 8 o'clock in the evening, the deceased came into the saloon, and drank with James Patterson, one of the defendants. During the time he was so in there, he and James got into a quarrel about paying for the drinks, or something else, about which none of the witnesses could entirely explain, when James wanted to fight, but being prevented from doing so by two of these defendants, his brother Charles and this defendant Adams, and perhaps others, he desisted, and deceased went out of the room. The evidence is then conflicting, as to what took place in reference to what had previously occurred. Deceased then went up to the church, and shortly afterward got into a dispute with one Stephen Goodwin, created considerable confusion there, exhibited a pistol and threat-

ened to shoot any one who interfered with him. The defendants remained in the saloon and around it for some time, when they, with three others, Hoover, Norris and Livingston, also went up to the church. The meeting had just adjourned, and the people were leaving. They passed up into the crowd, where the deceased was. James Patterson, who had had the quarrel with the deceased in the saloon, immediately struck deceased, who stepped back a little and asked who struck him. When James Patterson said, ' He has a pistol, let us take it from him.' Deceased first denied having it. Then James Patterson, Charles Patterson and this defendant seized him to take the pistol from him. The evidence is somewhat conflicting as to what was said and done, while they were trying to take the pistol from him, and after scuffling for a while over the pistol, James Patterson said, 'Now I have it,' and immediately afterward the pistol fired, deceased fell to the ground and very soon expired. He was shot in the back part of the head, the ball ranging inward and downward, and lodged in the base of the brain."

With this statement of the facts of this case, we pass now to the consideration and decision of the questions presented and discussed by his counsel in this court. We pass over the first two causes for a new trial, which relate to the legality of the verdict and the sufficiency of the evidence in support of it, and we will first consider the instructions of the court, which are complained of in argument by the appellant's counsel. The first of the instructions thus complained of is, that one, or it may be parts of two instructions, (for the numbering of the instructions is evidently confused,) in which the court undertook to define manslaughter. The court said :

" Manslaughter is defined, as follows, by the statute : ' If any person shall unlawfully kill any human being without malice express or implied either voluntarily upon

a sudden heat, or involuntarily, but in the commission of some unlawful act, such person shall be deemed guilty of manslaughter.'" In commenting upon this statutory definition of manslaughter, as distinguished from murder, the court immediately added, in the next instruction, the following explanatory definition of the former grade of homicide: " You will observe that, in manslaughter and in murder, there is the common element of intent to kill. The distinction is, that in murder malice, either express or implied, is present, while in manslaughter it is absent; for, in the latter case, the killing must be done without malice, either express or implied. The intention to kill must grow out of hot blood, in order to reduce an unlawful homicide to the grade of manslaughter."

It will be seen from the instruction quoted, that the court apparently ignored the idea, that there could be a case of manslaughter, without any intent to kill. The court directed the attention of the jury to the point, that in manslaughter, as well as in murder, there was the " common element of intent to kill," but throughout the instructions the jury were never informed that there was, or could be, manslaughter without any intention to kill. It is this omission of the court to instruct the jury in regard to a grade of homicide well recognized in and by our law, of which the appellant's counsel complains in argument, in this court. But it seems to us, that the appellant is in no condition to complain in this court of the omission of the circuit court to instruct the jury fully in regard to involuntary manslaughter. No complaint is made by the appellant of the instructions given; but the only complaint is that the court omitted an instruction which, the appellant claims, was applicable to the case made by the evidence and ought to have been given. This may be conceded; but before the court could be charged with positive error, on account of its omission to instruct the jury in relation

to involuntary manslaughter, it was necessary, we think, that the appellant should have requested of the court such an instruction. If the appellant had requested such an instruction, and if the court had failed or refused to comply with such request, then, but not until then, the appellant could have complained of the omission of the court to instruct the jury in relation to involuntary manslaughter, as probably erroneous. The record fails to show, that the appellant requested of the court any such instruction, and therefore he can not be heard to complain of the court's omission to give such instruction. *Rollins* v. *The State,* 62 Ind. 46.

It is insisted by the appellant's counsel, with much earnestness and ability, that the evidence adduced upon the trial of this cause was not sufficient to support the verdict of the jury, and that, for this reason, the verdict was contrary to law. From the evidence in the record, and from the facts apparently established thereby, we incline to the opinion, that if the defendant James Patterson had been on trial, the jury might have fairly and reasonably found, that, in the killing of Anthony White, he was guilty only, if guilty at all, of the crime of involuntary manslaughter, as the same is defined in our statute. It would seem from the evidence, that the shot, which caused the death of White, was fired while the pistol was in the hands of James Patterson. Whether the pistol was fired purposely or unintentionally by James Patterson is a grave question in the case, about which there was no direct or positive evidence introduced on the trial; but it is a question, as it seems to us, upon which the absolute guilt, if there was any guilt, and the degree of guilt, of the appellant, William Adams, of the crime for which he was indicted in this case, is entirely dependent.

There was no evidence introduced on the trial, from which it could be fairly and reasonably inferred, that the

appellant was a party to any arrangement or agreement for the killing of Anthony White, or that he was there aiding and abetting, or intending to aid and abet, in any such enterprise. Of course, all the presumptions in the case were in favor of the appellant, until they were removed or overcome by positive evidence. The evidence shows, and, as we read it, it shows nothing more than this, that the appellant was called upon by his companion and codefendant, James Patterson, to assist him and their associates in taking from Anthony White a pistol exhibited by him, and with which he threatened to shoot any one who interfered with him. The taking of this pistol from White was the only enterprise in which the appellant was asked to assist, and, so far as the evidence shows, it was the only enterprise in which he attempted to participate. This enterprise, the taking of the pistol from White, may or may not have been, under the surrounding circumstances, an unlawful act. If it be conceded, however, that the taking of the pistol from White was an unlawful act, it is certain, we think, that this act in and of itself, separate and apart from the fatal consequences of the act, was nothing more than a misdemeanor. It was not a felonious taking, because it does not appear that there was any intention, on the part of any of the participants in the taking, of depriving White of his property in the pistol.

It would seem from the evidence in this case, that, if any one was guilty of the death of Anthony White, it was the defendant James Patterson; and as to him we think the evidence fails to show, that, in the killing of White, he was guilty, beyond a reasonable doubt, of any higher grade of homicide than manslaughter. Assuming from the evidence, as we may fairly assume, that James Patterson, in the homicide of White, was guilty of no higher grade of crime than manslaughter, then the question remains, and, as it affects the appellant, Adams, the important and con-

trolling question in this case, was James Patterson guilty of voluntary or involuntary manslaughter? In the statute of this State defining felonies and prescribing punishment therefor, these two grades of homicide are classed together and defined, in the same section, and to each the same punishment is affixed. But the two grades are widely and essentially different, each from the other, as well we think in the moral turpitude of the crime, as in the constituent facts which determine the grade and character of the offence. Voluntary and involuntary manslaughter, as defined in the statute, " differ from each other in this: That, in the first kind, the unlawful killing is voluntary, that is, the killing is done by design or intention, or purposely ; but, in the second kind, the unlawful killing is involuntary, that is, without any design, intention, or purpose of killing, but in the commission of some unlawful act." *Bruner* v. *The State*, 58 Ind. 159. These two kinds of manslaughter are so widely different from each other, that, in the case just cited, we held, and we think correctly so, that, where a party was charged in an indictment with the commission of voluntary manslaughter, he could not be rightfully convicted, if the evidence showed that he was guilty, if guilty at all, of involuntary manslaughter.

If, now, it be conceded in the case at bar, that the taking of the pistol from Anthony White was an unlawful act, and if, while engaged in this unlawful act, in the struggle for the pistol, and when it was in the hands of the defendant James Patterson, it was accidentally discharged, and the shot thus fired, without any design, intention or purpose of killing, caused the death of White, it is very clear, we think, that the defendant James Patterson, in such killing of White, would be guilty only of involuntary manslaughter, as the same is defined in the statute of this State. If, as we have seen, the appellant,

Adams, was called upon by James Patterson, to partici-pate, and did participate, in the commission of the unlawful act of taking the pistol from White, which act we regard as merely a misdemeanor, can it be correctly said, that the appellant, as the aider and abettor of Patterson in the commission of such misdemeanor, be-came and was his aider and abettor in the involuntary manslaughter which resulted from such misdemeanor? Can there be an aider and abettor in a case of involun-tary manslaughter? It seems clear to us, that these ques-tions must be answered in the negative. An aider and abettor is one who assists another in the accomplishment of a common design or purpose; he must be aware of, and consent to, such design or purpose But, as we have seen, in involuntary manslaughter, the killing is done without any design or purpose of killing; and if the perpetrator of the crime had no design or purpose of committing it, it is very certain, we think, that there could be no aider or abettor in such crime.

The case of *Regina* v. *Skeet*, 4 F. & F. 931, decided in 1866, is very much in point, and fully sustains the con-clusions we have reached in the case now before us In the case cited, Skeet and several others were indicted for the murder of one Hayton. The facts of the case were, that, on the night of the homicide, the prisoners were all out trespassing, going through a wood in the direction of a game cover, Skeet being the only man who had a gun. The deceased, one of the game-keepers, having heard a shot, went out alone, armed only with a stick, in the direc-tion of the sound. Soon after the deceased went towards the prisoners, a cry was heard and then a shot, and, when the other keepers came up to him, he was found lying dead, shot through the heart. The prisoners being arrested made statements; the statement of Skeet being, that " The keeper seized the gun, and being cocked and

loaded, it went off by being snatched at." The other prisoners merely stated that they heard the shot, except that one of them stated that Skeet fired the shot.

Skeet was found guilty of manslaughter. POLLOCK, C. B., said: ".As regards the other prisoners—there is no evidence against them; and it is admitted that they can not be liable except upon the doctrine of constructive homicide, which, as I have already laid down, does not apply where the only evidence is that the parties were engaged in an unlawful purpose: not being felonious. It only applies in cases where the common purpose is felonious, as in cases of burglary where all the parties are aware that deadly weapons are taken with a view to inflict death or commit felonious violence, if resistance is offered. * * * * * Therefore, as there is no evidence against the other prisoners of complicity in any such design, or in the act of firing, they must all be acquitted both of murder and manslaughter."

In a note to the case cited, it is said: "It is the common design or intention to kill in the prosecution of the unlawful object, whether it be misdemeanor or felony, which involves the others in the guilt of homicide. For, even if the common purpose is felonious, if only the actual perpetrator of the act had the intention to kill in the prosecution of the purpose, the others, who did not concur in the act, are not guilty of the act of homicide, as where a robber or burglar puts a pistol in his pocket unknown to his fellows."

In the case of *Regina* v. *Cruse*, 8 Car. & P. 881, where Cruse was indicted for an assault and battery, with intent to murder, and his wife was charged with aiding and abetting him, it was held to be essential to the conviction of the wife, that she should have been aware of her husband's intention to commit murder.

Our conclusion is, that the evidence in the record is not

sufficient in law to sustain the verdict of the jury against the appellant, William Adams, or to authorize his conviction of the crime, for which he was indicted. For this reason, we think that the court erred in overruling his motion for a new trial.

The judgment is reversed, and the cause is remanded for a new trial.

The clerk will issue the proper notice for the return of the appellant to the sheriff of Owen county.