The State v. Brooks.

THE STATE v. BROOKS, *alias* MAXWELL, *Appellant*.

1. **Criminal Practice:** INDICTMENT: ILLEGAL ARREST. It is no ground for quashing an indictment, that, previous to its finding, the defendant had been illegally arrested, and was in custody, under such arrest, when it was found.

2. ———: IMPANELING JURORS: MISNOMER. In response to an application by defendant, under section 1, Acts of 1885, p. 74, for a special jury, a list of the persons summoned as jurors was furnished defendant's counsel; when the name of Harry *Picker* was called, one Harry *Vicker* answered; when the name of Ernest *Gahl* was called, one Ernest *Gaier* responded, and to the name, William *Richardson*, William *Riches* answered. *Held*, that an objection, by defendant's counsel, to proceeding with the trial until a corrected list of the jurors should be furnished, was properly overruled.

3. ———: PUBLIC TRIAL. The right of a defendant in a criminal case to a public trial is not violated where, after admitting the public, until the seats of the courtroom are filled, others, seeking admission, are excluded.

4. ———: JUROR: EXAMINATION ON VOIR DIRE. A proposed juror, after having stated on his *voir dire* that he had formed an opinion, based on newspaper reports, can be asked whether, if sworn as a juror, he could give the accused an impartial trial.

5. ———: ———: ———. Where jurors have already been sufficiently examined on their *voir dire*, the trial court commits no error in refusing to permit further questions touching their qualifications.

6. ———: QUALIFICATION OF JUROR. No error was committed in sustaining the state's challenge to a juror who, after stating that he had formed an opinion from what he had read, was asked whether, notwithstanding the opinion he had formed, he could give the accused a fair and impartial trial, to which he replied: "That is very doubtful."

7. ———: ———. Persons are competent, as jurors, who state that, although they have formed opinions from reports, which it would require evidence to remove, they can try the case fairly and impartially, on the law and the evidence.

8. ———: EXTRA JUDICIAL CONFESSION. While the fact that

The State v. Brooks.

artifice and deceit were resorted to in obtaining a confession from a person accused of crime, might properly be considered as affecting the credibility of the witness, yet it is not a matter which renders him incompetent to testify as to such confession.

9. ——— : CONFESSION OBTAINED BY FRAUD AND ARTIFICE. A confession made by the defendant, while confined in jail awaiting trial, to a detective, placed there by the procurement and instigation of the circuit attorney and his assistant, upon a fictitious charge of crime, in order to ingratiate himself into defendant's confidence, is admissible in evidence on the trial of defendant. (Sherwood, J., dissenting).

10. ——— : EXHUMING CORPSE BY STATE : RIGHTS OF DEFENDANT. The defendant's counsel, during the progress of the trial, which was one for murder, called the court's attention to the fact that the corpse of the deceased had been exhumed by the state, without notice to the defendant, and requested permission for his experts to examine said corpse. *Held*, that, in the absence of authority as to the legal necessity of such notice, it was not error for the court to defer granting the motion until made necessary by the evidence which the state should introduce predicated upon its examination of the corpse.

11. ——— : ——— : EVIDENCE OF MEDICAL EXPERTS. The evidence of medical experts as to the condition in which they found the body of the deceased, on a second *post mortem* examination, is not inadmissible because such examination was made without notice to the defendant.

12. ———. The action of the court in refusing to direct the attorney for the state to permit physicians, named by defendant, to examine the remains of the deceased, exhumed during the trial, and as to which experts offered by the state testified, in rebuttal, is not before the Supreme Court for revision, where the record does not show that any exception was taken to the court's ruling.

13. ——— : CROSS-EXAMINATION OF DEFENDANT. A cross-examination of a defendant, offering himself as a witness, as to matters not referred to in his examination in chief, will not be a ground for reversing the judgment, where such improper cross-examination related to matters of no importance, and which could not have affected the verdict. (Sherwood, J., dissenting as to cross-examination in this case).

14. ——— : SEVERAL COUNTS : ONE GOOD COUNT : GENERAL VERDICT. Where there are several counts in an indictment, charging the same offence, one good count will sustain a general verdict of guilty.

The State v. Brooks.

15. ———— : ———— : INSTRUCTIONS. Where there are several counts in an indictment charging the same offence, the court need not charge the jury separately, as to each count, but may, in one instruction, refer to them all, and tell the jury to render a verdict of guilty, if they find the accused to have perpetrated the crime in the manner charged in either of the counts of the indictment.

16. ———— : MURDER : INSTRUCTIONS. An instruction on a trial for murder, which told the jury that if they believed, from the evidence, the defendant did kill and murder the deceased, in the manner and form charged in either of the counts of the indictment, they should find the defendant guilty of murder in the first degree, is not erroneous because of the omission, before the words, "kill and murder," of the words, "wilfully, deliberately, premeditatedly, and with malice aforethought," it appearing that the court, in a previous part of the instructions, had fully explained to the jury that the indictment not only set forth the means and modes used by the defendant in killing the deceased, but that it also charged him with doing the killing by these means, feloniously, wilfully, deliberately, premeditatedly, and with malice aforethought, and it also appearing that the jury were required by the instruction to find that the killing was done, not only in the manner, but also in the form, charged in the indictment.

17. ———— : ———— : ————. Nor was there error in the use of the word "murder," in the instruction, without explaining its meaning, inasmuch as it was only necessary for the jury to find that the accused did kill the deceased, as charged in the indictment, which the instructions required them to find.

18. ———— : FLIGHT OF ACCUSED : INSTRUCTION. The evidence in this case held to afford sufficient basis to authorize an instruction on the question of defendant's flight, after the commission of the offence.

19. ———— : MURDER : INSTRUCTIONS. The instructions given in this case, which was a trial for murder in the first degree, approved by the court.

20. ———— : FAILURE TO INSTRUCT AS TO [EXTRA–JUDICIAL CONFESSIONS. The failure or omission of the trial court to instruct the jury, on a trial for murder, in the absence of a request to that effect, that they could not convict upon the extra-judicial confessions of defendant, uncorroborated and without proof *aliunde* that the crime had been committed, is not error, nor in conflict with Revised Statutes, section 1908, providing that the court must instruct upon all questions of law, arising in the case, which are necessary for the information of the jury in giving their verdict. (Sherwood, J., dissenting).

21. ·——— : IMPROPER REMARKS OF COUNSEL FOR STATE. The Supreme Court is not disposed to interfere with judgments of the trial courts because of alleged improper remarks of counsel for the state, made in their arguments to the jury.

22. ——— : ———. The remarks complained of in this case examined, and held no ground for reversing the judgment. (Sherwood, J., dissenting).

23. ——— : READING FROM LAW BOOKS TO JURY. The practice of reading from law books to the jury is one not to be commended.

24. ——— : PREJUDICE OF JUROR. The trial court held to have committed no error in finding that the charge that a juror had formed and expressed an opinion hostile to the defendant, which he concealed on his *voir dire* examination, was unproved.

25. ——— : MOTION FOR NEW TRIAL. The statute (R. S., sec. 1967), requiring a motion for new trial to be filed within four days after the verdict, is mandatory.

26. **Semble,** that the statute does not authorize the filing of a supplementary motion for a new trial after the expiration of four days from the verdict. But even if the court had the authority, in its discretion, to permit such motion to be filed, its refusal to do so was not arbitrarily exercised, in this case.

*Appeal from St. Louis Criminal Court.*—HON. G. S. VAN WAGONER, Judge.

AFFIRMED.

The defendant, appellant here, was indicted at the October term, 1885, of the St. Louis criminal court, for the murder, in the first degree, of Charles Arthur Preller. The indictment contained three counts charging the crime to have been committed on April 5, 1885, in the city of St. Louis: (1) By chloroforming the deceased until unconscious, and then choking and strangling him to death. (2) By chloroforming the deceased until unconscious, and then suffocating and smothering him by enclosing him in a fastened trunk; and (3) by some means, unknown to the grand jury, in the perpetration

of a robbery. The verdict was a general one of guilty, as charged in the indictment.

The testimony of the state in this case tended to show, in substance, as follows: The defendant, Hugh Mottram Brooks, under the assumed name of Walter H. Lennox–Maxwell, met the deceased at the Southern Hotel, in the city of St. Louis, on the third day of April, 1885, by appointment, there having been some previous correspondence between them regarding a journey in company to San Francisco, and thence to New Zealand, although no definite plan had been agreed upon. The defendant had been a guest at the hotel for several days prior to the arrival of deceased, and was apparently pressed for money, having endeavored to pawn his watch and sundry trinkets and to sell some stereopticon apparatus in order to raise money. The deceased, Charles Arthur Preller, had an unusually large amount of baggage, and seemed anxious to prosecute his journey westward without delay. On several occasions he displayed a considerable sum of money, made many purchases, and gave indications of being well provided with funds. The two men were Englishmen, apparently traveling for pleasure; the prisoner representing himself to be a physician, and the deceased being a commercial traveler. After Preller's arrival at the hotel, he and the defendant were inseparable, spending much time in the prisoner's apartment, and in the billiard room. Preller was rather reserved, but defendant was affable and communicative.

Preller was last seen alive in defendant's room, shortly after dinner on Sunday, April 5, 1885. On that evening and the following day, defendant told several persons at the hotel that his friend had gone to the country to visit acquaintances, and would return in a few days. On Monday, April 6, 1885, defendant made purchases of jewelry, wearing apparel, traveling equipage, etc.; displayed large sums of money; changed his appearance by shaving off his beard; assumed *aliases;* paid his

week's bill at the hotel, and without notice of departure, took the night train for San Francisco, leaving in his room two trunks, one of which he had brought with him to the hotel, and the other he had purchased and sent to his room on that day. On the train westward he assumed the name of D'Auguier, representing himself to be a French officer, and on arriving at San Francisco, after spending the night in a brothel, embarked on a steamship for Auckland, New Zealand, as a steerage passenger, under the name of D'Auguier.

On April 14 following, an offensive odor in the room that had been occupied by defendant at the hotel in St. Louis, led to its examination. The new trunk stood on top of the old one, just as it had been left by the defendant. The lower trunk was tightly corded and strapped, so that it was opened with difficulty, and was found to contain the dead body of Preller, partially decomposed, and so cramped and distorted that the trunk had to be broken in order to take out the corpse. The body was naked with the exception of a pair of drawers having the name, "H. M. Brooks", on the waistband. The moustache and whiskers had been clipped off with scissors. Two gashes, skin deep, were upon the breast in the form of a cross. The eyes were swollen, and the tongue protruded from the mouth. On the inside of the trunk was a paper placard bearing the inscription, "So perish all traitors to the great cause," in the handwriting of defendant.

An inquest was held on the body, and an examination of the viscera by the professor of chemistry in Washington University, St. Louis, disclosed the presence of sufficient chloroform to destroy life. Defendant had purchased a considerable quantity of the drug from an apothecary in the vicinity of the Southern Hotel on Sunday, April 5, and an empty phial bearing the apothecary's label was found in the room, together with several

other phials containing subtle poisons and dangerous drugs.

An information was filed in the court of criminal correction by the prosecuting attorney, upon the affidavit of the coroner, charging defendant with murder, and such proceedings were had as secured his apprehension on board the steamer off Auckland, and his subsequent extradition.

When captured, the defendant had in his possession about one hundred and twenty-five dollars in money, some jewelry of the deceased and articles of the latter's wearing apparel. The defendant then stated that his name was D'Auguier, that he had never borne the name of Maxwell, although articles having on them the name of W. H. Lennox-Maxwell were found in his possession. He also stated that he had never been in St. Louis, but a diary found in his pocket contained a memorandum that he arrived in St. Louis March 31, 1885, and left that place April 6, following. Defendant testified in his own behalf, that, on Sunday afternoon, April 5, 1885, in his room at the Southern Hotel, at Preller's request, he attempted to insert in the latter's urethra, a catheter for stricture, and that, with Preller's consent, and at his request, for the purpose of the operation, he administered chloroform with fatal results; that, alarmed at the probable consequences to himself; not knowing that, on a trial for the homicide, he would be permitted to testify in his own behalf; supposing the law to be the same here as in England in that respect, he stripped Preller's body, placed it in the trunk, and after taking steps to evade the authorities and prevent his identification, and after taking all Preller's money, he fled in the hope of escaping arrest and trial; that his subsequent conduct was due to liquor and mental distress.

Defendant moved to quash the indictment and to dismiss all proceedings against him on the ground that the warrant for his arrest was issued without "probable

cause supported by oath or affirmation," for the reason that the complaint on which the warrant was issued was insufficiently verified. The *jurat* was as follows: "Sylvester L. Nidelet, being duly sworn, says the facts stated in the above information are true according to his best information and belief." The court overruled the motion and defendant excepted.

The facts referred to in the opinion of the court, as also in the dissenting opinion, concerning the defendant's confession made while in jail, were substantially as follows: One John F. McCullough, a detective, by the procurement, and at the instigation of the circuit attorney and his assistant, had himself arrested upon a fictitious charge of forgery, under the name of Dingfelder, waived preliminary examination, was indicted by the grand jury, whose advisory officer was the said assistant circuit attorney, upon the testimony of witnesses appearing and testifying before that body to facts supposed by them to be true, but known to said officials to be false ; and was arraigned at the bar of the criminal court, pleading "not guilty" to the indictment. This was done for the purpose of placing said detective in jail, that he might obtain from the defendant a confession. He remained in jail forty-seven days and nights under these proceedings, and was put upon the witness stand by the prosecution, and testified, over the objection of defendant, to a confession of guilt alleged by him to have been thus obtained from defendant in jail. The other exceptions taken to the trial court's action sufficiently appear in the opinion.

The instructions given in the case were as follows:

"Gentlemen of the jury: By this indictment the defendant, Hugh Mottram Brooks, *alias* W. H. Maxwell, *alias* Walter H. Lennox-Maxwell, M. D., *alias* Theodore Cecil D'Auguier, is charged with the offence of murder in the first degree.

" This indictment contains three counts, and in each

of said counts the defendant is charged with the offence of murder in the first degree.

" By the first count of this indictment it is alleged, that, at the city of St. Louis and state of Missouri, and on the fifth day of April, A. D., 1885, the defendant, with force and arms in and upon one Charles Arthur Preller, feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did make an assault ; and that the said defendant then and there a large quantity of a certain deadly poison and liquid, called chloroform, feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did give and administer unto the said Charles Arthur Preller, with the intent that he, the said Charler Arthur Preller, should take and inhale the same into his body and lungs ; that the said defendant then and there well knew the said liquid and chloroform to be a deadly poison, and that the said liquid and chloroform and deadly poison so given and administered unto the said Charles Arthur Preller by the defendant, the said Charles Arthur Preller did then and there take and inhale into his body and lungs, and that, by reason and by means of the taking and inhaling the said liquid and chloroform and deadly poison into the body and lungs of the said Charles Arthur Preller, given and administered by the said defendant, the said Charles Arthur Preller became and was then and there unconscious and insensible, and in a stupor of body and mind, and was then and there helpless, and wholly in the power and under the control of the said defendant, and that the said defendant then and there, well knowing the helpless, unconcious and insensible condition of the said Charles Arthur Preller, and wickedly contriving and intending then and there the said Charles Arthur Preller feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought to kill and murder, with both his hands upon and about the neck of him, the said Charles Arthur

Preller, then and there feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did squeeze, choke, suffocate, and strangle the said Charles Arthur Preller, and that, by reason and by means of said squeezing, choking, suffocating, and strangling, and the use of the liquid and chloroform as aforesaid, the said Charles Arthur Preller did then and there instantly die.

" By the second count of this indictment it is alleged that, at the city of St. Louis and state of Missouri, and on the fifth day of April, A. D., 1885, the defendant, with force and arms in and upon one Charles Arthur Preller, feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did make an assault, and that the said defendant then and there a large quantity of a certain deadly poison and liquid called chloroform, feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, did give and administer unto the said Charles Arthur Preller, with the intent that he, the said Charles Arthur Preller, should take and inhale the same into his body and lungs ; that the said defendant then and there well knew the said liquid and chloroform to be a deadly poison, and that the said liquid and chloroform and deadly poison, so given and administered unto the said Charles Arthur Preller, by the defendant, the said Charles Arthur Preller did then and there take, and inhale into his body and lungs, and that, by reason and by means of the taking and inhaling of the said liquid and chloroform and deadly poison into the body and lungs of the said Charles Arthur Preller, given and administered by the said defendant, the said Charles Arthur Preller became and was then and there unconscious, and insensible, and in a stupor of body and mind, and was then and there helpless and wholly in the power and under the control of the said defendant, and that the said defendant, then and there well knowing the helpless,

unconscious and insensible condition of the said Charles Arthur Preller, and wickedly contriving and intending, then and there the said Charles Arthur Preller feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, to kill and murder, did then and there feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought, with both his hands upon and about the neck and body of him, the said Charles Arthur Preller, then and there with great force and violence squeeze into and confine the said Charles Arthur Preller in a certain large zinc trunk, and did then and there securely tie and fasten down the lid of said trunk with ropes and straps, whereby the said Charles Arthur Preller was then and there smothered, suffocated, and strangled, and that, by reason and by means of which said smothering, suffocating and strangling, and by the taking and inhaling of the liquid, poison and chloroform, as aforesaid, the said Charles Arthur Preller did then and there instantly die.

" By the third count of this indictment it is alleged that, at the city of St. Louis and state of Missouri, and on the fifth day of April, A. D., 1885, the defendant, in the perpetration of a robbery from the person of one Charles Arthur Preller, with force and arms, did, unlawfully, wilfully, feloniously, and of his malice aforethought, make an assault in and upon the said Charles Arthur Preller, and that the said defendant in some way and manner, and by some means, devices, instruments, and weapons to the grand jurors unknown, did, then and there, unlawfully, feloniously, wilfully, and of his malice aforethought, deprive the said Charles Arthur Preller of life, so that the said Charles Arthur Preller did then and there instantly die.

"The court instructs the jury that if they believe and find, from the evidence in the cause, that, at the city of St. Louis, and state of Missouri, the defendant, Hugh Mottram Brooks, *alias* W. H. Maxwell, *alias*

Walter H. Lennox-Maxwell, M. D., *alias* Theodore Cecil D'Auguier, did, on the fifth day of April, A. D., 1885, or at any time prior to the finding of this indictment, kill and murder one Charles Arthur Preller in the manner and form charged in either of the counts of this indictment, they should find the defendant guilty of murder in the first degree. And unless the jury so believe and find, from the evidence, they should find the defendant not guilty of murder in the first degree.

"If the jury find the defendant guilty of murder in the first degree, they will simply so state in their verdict.

"The court instructs the jury that by the term 'feloniously' is meant wickedly and against the admonition of the law, that is, wickedly and unlawfully.

"By the term 'wilfully' is meant intentionally and not by accident.

"By the term 'deliberately' is meant done in a cool state of the blood, etc., etc. [As this term is correctly defined, this part of the instruction is omitted as not being material, no point being made thereon].

"By the term 'premeditatedly' is meant thought of beforehand, for any length of time, however short.

"The term 'malice,' as used in this indictment, does not mean in the legal sense mere spite, ill-will, hatred or dislike, as it is ordinarily understood, but it means that condition of mind which prompts one person to take the life of another person, without just cause or justification, and signifies the state of disposition which shows a heart regardless of social duty and fatally bent on mischief.

"And 'malice aforethought' means that the act was done with malice and premeditation.

"By 'robbery' is meant the felonious stealing, taking and carrying away of the personal property of another from his person, or in his presence against his will by violence, or putting him in fear.

"The court instructs the jury that if they believe and find from the evidence, that, at the city of St. Louis and state of Missouri, and within three years prior to the finding of this indictment, the defendant undertook to treat or operate upon the said Charles Arthur Preller for a disease, and did administer to the said Charles Arthur Preller a certain deadly poison, namely chloroform, so negligently, carelessly and recklessly, that the said Charles Arthur Preller then and there died from the effects of said chloroform, so administered by defendant, but without any intent on the part of the defendant to kill or to do bodily harm to said Charles Arthur Preller, then the jury should find the defendant guilty of manslaughter in the fourth degree, and assess his punishment at imprisonment in the penitentiary for a term of two years, or by imprisonment in the city jail for not less than six months, or by a fine of not less than five hundred dollars, or by both a fine of not less than one hundred dollars and imprisonment in the city jail not less than three months.

"The court further instructs the jury that if they believe and find, from the evidence, that the defendant was attempting to treat the said Charles Arthur Preller for some disease, and that in such treatment the defendant did, with the consent of the said Charles Arthur Preller, administer chloroform to the said Charles Arthur Preller, and that the defendant did administer such chloroform to the said Charles Arthur Preller in a careful, prudent and cautious manner in the treatment of such disease, and that the said Charles Arthur Preller then and there died from the effects of said chloroform, so administered by the defendant, then the jury should acquit the defendant.

"The court further instructs the jury that the intent with which an act is done may be proved by direct and positive evidence, or it may be inferred from all the facts and circumstances surrounding and attending the act,

and must be determined by the jury from the evidence given in this case.

"The jury are instructed that they may, from circumstantial evidence alone, find the defendant guilty when the facts established are inconsistent with any other theory than that of his guilt; but, in order to find the defendant guilty upon circumstantial evidence alone, the facts proved must be wholly inconsistent with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt.

"The court further instructs the jury that if they believe and find, from the evidence, that the defendant made any statement or statements in relation to the homicide charged by this indictment after said homicide is alleged to have been committed, the jury must consider such statement or statements altogether.

"The defendant is entitled to the benefit of what he said for himself, if true, and the state is entitled to the benefit of anything he said against himself in any statement or statements proved by the state.

"What the defendant said against himself, the law presumes to be true, because said against himself. What the defendant said for himself, the jury are not bound to believe, because it was said in a statement or statements proved by the state, but the jury may believe or disbelieve it as it is shown to be true or false by the evidence in this cause ; it is for the jury to consider, under all the circumstances, how much of the whole statement or statements of the defendant proved by the state, the jury, from the evidence in this cause, deem worthy of belief.

"The opinions of the experts who have testified in this cause is testimony which the jury should consider and examine, in connection with all the other testimony in this cause, subject to the same rules of credit or disbelief as the testimony of other witnesses.

"The opinions neither establish nor tend to establish

the truth of the facts upon which they are based ; neither are the hypothetical questions put to these experts by the counsel in the cause evidence of the truth of the matters stated in these questions.

" Whether the matter testified to by the witnesses in this cause as facts is true or false, is to be determined by the jury alone.

" Flight raises the presumption of guilt, and, if the jury believe and find, from the evidence, that the defendant, after the commission of the homicide alleged in this indictment, fled from the state of Missouri, and tried to avoid arrest and trial for said offence, they may take this fact into consideration in determining his guilt or innocence.

" The court instructs the jury that, although they may believe and find, from the evidence, that the defendant fled from the state of Missouri after the commission of the homicide alleged in this indictment, yet, if they believe and find, from the evidence, that he did not flee from a motive to avoid arrest and trial on this charge, they should not consider it as an element in arriving at their verdict as to the defendant's guilt or innocence of this charge.

" The previous good character of the defendant, if proved to your reasonable satisfaction, is a fact in the case which you ought to consider, in passing upon the question of his guilt or innocence of this charge, for the law presumes that a man whose character is good is less likely to commit a crime than one whose character is not good.

" But, if all the evidence in the case, including that which has been given touching the previous good character of the defendant, shows him to be guilty of the charge, then his previous good character cannot justify, excuse, palliate, or mitigate the offence.

" The court instructs the jury that the defendant is a competent witness in his own behalf, but the fact that

he is a witness testifying in his own behalf may be considered by the jury in determining the credibility of his testimony.

" The jury are the sole judges of the credibility of the witnesses, and of the weight and value to be given to their testimony. In determining such credibility, weight, and value, the jury should take into consideration the character of the witness, his or her manner on the witness stand, his or her interest, if any, in the result, his or her relation to, or feelings for or against, the defendant or deceased, the probability or improbability of his or her statement, as well as of all the facts and circumstances given in evidence in this cause.

" And, in this connection, you are instructed that, if you shall believe, from the evidence, that any witness or witnesses have wilfully testified falsely to any material fact in this cause, you are at liberty to disregard the whole, or any portion of any such witness' or witnesses' testimony.

" The law presumes defendant to be innocent, and this presumption continues until it has been overcome by proof which establishes his guilt to your satisfaction and beyond a reasonable doubt; and the burden of proving his guilt rests upon the state.

" When this presumption has been thus overcome, and, when the guilt of the defendant has thus been made clearly to appear, your duty is to convict him; but if by the evidence you are not convinced of his guilt beyond a reasonable doubt, your duty is to acquit him.

" By the term 'convinced beyond a reasonable doubt' is meant convinced to a moral certainty. But to authorize an acquittal on the ground of reasonable doubt alone, such doubt should be a substantial doubt, arising out of the evidence in the cause, and not a mere possibility that the defendant is innocent.

" You will now, gentlemen of the jury, listen to the arguments of counsel, who will endeavor to aid you to

reach a proper verdict in this cause, by refreshing in your minds the evidence which has been given to you in this cause, and by showing the application thereof to the law ; but, whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberations by the evidence, as you understand it and remember it to be, and by the law as given in these instructions, and render such verdict as, in your conscience and reason and candid judgment, seems to be just and proper."

*Martin & Fauntleroy* for appellant.

(1) The motion to quash the indictment and proceedings against appellant and restore him to his liberty should have been sustained. He was deprived of his liberty without due process of law. Bill of Rights, secs. 30 and 11 ; Fourteenth Amendment of Constitution of United States ; *Bridgeford v. Steamboat Co.*, 6 Mo. 356. The failure to grant appellant a preliminary examination vitiated the proceedings. Bill of Rights, sec. 12 ; Schedule of Missouri Constitution, sec. 12. (2) It was error to refuse appellant's demand for a list of the jurors summoned by the sheriff, and to force him to trial without such list. Acts 1885, p. 74 ; R. S. 1879, sec. 1889 ; *State v. McCarson*, 51 Mo. 27 ; *State v. Waters*, 62 Mo. 196 ; 54 Mo. 153. (3) It was error to deny appellant a public trial. Bill of Rights, sec. 22 ; R. S. 1879, sec. 1036. (4) It was error to permit counsel for state, in the *voir dire* examination of the jurors, to induce the jurors to state which way their prejudices and opinions inclined. It was prejudicial to appellant's case, and clearly wrong. (5) It was error to refuse to permit appellant's counsel to ascertain from the jurors, on their *voir dire* examination, whether or not they had formed or expressed any opinion as to any material facts to be tried. R. S. 1879, sec. 1897 ; *State v. Mann*, 83

Mo. 589; *State v. Taylor*, 64 Mo. 358. (6) It was error to refuse to permit appellant's counsel to ask the juror, Alt, whether he would consent to find a verdict, though not himself satisfied of guilt, out of deference to the wishes or views of the other jurors. (7) It was error to sustain the state's challenge of jurors on the grounds that they were not twenty-one years of age, were over sixty-five years of age, were not residents of the city, etc. These are not good grounds for challenge of special jurors. R. S. 1879, secs. 2776, 2802; R. S. 1879, chap. 5 of appendix, p. 1519; Session Acts, 1885, p. 74. (8) The court erred in sustaining the state's challenge of juror Theodore Schindler, on the ground that he did not understand the English language. His *voir dire* examination showed that he read and wrote, and understood the language. (9) The court erred in sustaining state's challenge of the juror Thomas H. Rich, who was certainly unobjectionable to the prosecution, and of whom the defence did not complain. (10) The court erred in overruling appellant's challenge of the juror Wm. F. Knollman, and especially in refusing to permit his counsel to ascertain from the juror what it was that he had read in the newspapers, the juror having stated that he had an opinion based upon conversations and what he had read in the newspapers. It may have been the coroner's inquest testimony which the juror read. Besides, the juror was prejudiced and biased. (11) The court erred in overruling appellant's challenge of the juror James E. Comfort. He had formed an opinion, and it did not appear that this opinion was founded on rumor and newspaper reports only, and that it did not prejudice or bias his mind. He was both biased and prejudiced. (12) It was error to admit in evidence the Dingfelder confessional evidence. (*a*) Because it was against public policy, both as being the fruit of crime, and as tending to encourage and promote the commission of crime. (*b*) Because of the extreme danger and

probability that such a plot will result in a manufactured confession, if it fails to obtain one in fact. (*c*) Because (if made) it was obtained under the flattery of hope, and was not made voluntarily and with that knowledge and appreciation of the consequences necessary to render a confession admissible, even in court. (*d*) Because the law will not permit the prosecuting attorney to resort to such means, even if others may. The exalted nature and the dignity of his office forbid it, and his duty towards the accused forbids it. (*e*) Because the court erred in not permitting appellant's counsel to examine into and bring to the knowledge of the court the character, antecedents, etc., of the detective, Dingfelder, before he was permitted to give in evidence the alleged confession. (*f*) Because the methods and modes of such a plot are condemned and repudiated by all mankind. (13) The court erred in admitting in evidence the result of the *post mortem* examination made pending the trial. The examination having been made without notice to appellant, and without his knowledge, the evidence was *ex parte* and inadmissible. 2 Whar. & Stille's Med. Juris., part 2, sec. 1246. (14) It was error for the prosecution to refuse to permit Dr. Bauer, appellant's expert, to examine the parts exhumed, and it was error for the court to refuse an order compelling the prosecution to do so. (15) It was error most hurtful and prejudicial to appellant when the court permitted counsel for the state to cross-examine him as to matters not referred to in his direct examination. This cannot be done even for the purpose of impeachment. *State v. Palmer*, 88 Mo. 568; *State v. McLaughlin*, 76 Mo. 320; *State v. McGraw*, 74 Mo. 573. (16) The instructions were erroneous in telling the jury that the third count of the indictment charged appellant with murder in the first degree, because said court, by reason of its failure to state who was deprived of life, did not charge murder at all, but at most a common assault. *State v. Houston*,.

19 Mo; 211; *State v. Williams*, 30 Mo. 364; *State v. Pemberton*, 30 Mo. 376; *State v. Edwards,* 70 Mo. 480; *State v. Sides*, 64 Mo. 383; *State v. Blair*, 69 Mo. 317. (17) The court, in its instructions, undertook to tell the jury what each count charged, and in doing so the court supplied the fatal omission in the third count above mentioned, by inserting the name of Preller, where there was the blank in the indictment. (18) The instructions were erroneous in telling the jury to convict of murder in the first degree, if they believed and found, from the evidence, that defendant "did kill and murder one Charles Arthur Preller, in the manner and form charged in either of the counts of the indictment." *State v. Hollenscheit*, 61 Mo. 302. (19) The instruction as to manslaughter in the fourth degree was erroneous, in that it required the jury to find that the defendant was treating Preller for an actual disease, before they could convict him of that offence, and the next instruction, for an absolute acquittal, made the same requirements. If appellant was treating him for some supposed disease, the law would be the same as though the disease actually existed. (20) The instruction as to the flight of appellant was erroneous, in that the court therein failed to call the attention of the jury to certain matters explanatory of the flight. *State v. King*, 78 Mo. 555; Wharton's Crim. Evid. [9 Ed.] sec. 750. And this instruction, in which the jury were told that "flight raises the presumption of guilt," was also erroneous, we think, because it failed to tell the jury how long this presumption continued, or whether it could be overcome at all or not. (21) The instruction as to "good character" of appellant was erroneous. It was erroneous in telling the jury that the previous good character of the accused was to be considered only as to the charge of murder, and only in the event that it was proved to their reasonable satisfaction. (22) The instructions as

to the credibility of the witnesses authorized the jury to take into consideration the character of witnesses, whether there was any evidence thereto or not. This was error. *State v. Little*, 67 Mo. 624. (23) The next instruction, authorizing the jury to reject the testimony of any witness who had wilfully testified falsely "to any material fact in this cause," was erroneous, as leaving a question of law to the jury. And especially was it erroneous in this case, owing to the peculiar form and effect of the instruction which authorized a conviction upon a finding that the defendant "did kill and murder deceased in the manner and form charged in either count of this indictment," no statement of the facts being made, nor definition of the term murder being given. *Fugate v. Carter*, 6 Mo. 267; *Digby v. Insurance Co.*, 3 Mo. App. 603; *Anderson v. McPike*, 86 Mo. 293; *State v. King*, 78 Mo 555. (24) The instruction which required that a doubt of guilt, in order to warrant an acquittal, must not only be a "reasonable" doubt, but moreover, a "substantial" one, was erroneous. This instruction was erroneous because the law is that the existence of a reasonable doubt is enough to warrant and require an acquittal, without more. And so the jury were told in another instruction in this case, the two instructions being inconsistent and contradictory, and for that reason, also, erroneous. (25) The last instruction given was erroneous, as an improper attempt to interfere with the arguments of counsel, by cautioning the jury against whatever counsel might say, and in directing the jury to render "such verdict as in your conscience and reason and candid judgment seems to be just and proper." *Bailey v. Ormsby*, 3 Mo. 580; *Cleveland v. Davis*, 3 Mo. 331. (26) The settled law of this state is that no conviction can be based upon an extrajudicial confession alone. *State v. Robinson*, 12 Mo. 592; *State v. Scott*, 39 Mo. 424; *State v. German*, 54 Mo. 526; *State v. Patterson*, 73 Mo. 693. And under the

law, it was the duty of the court to so instruct the jury, and the failure to do so was error. R. S. 1879, sec. 1908; *State v. Banks*, 73 Mo. 592; *State v. Branstetter*, 65 Mo. 149; *State v. Jones*, 61 Mo. 232; *State v. Jones*, 64 Mo. 391; *State v. Heed*, 57 Mo. 252. (27) The instruction given in this case, to the effect that what the accused said against himself the law presumes to be true, but what he said for himself was only to be believed so far as it was shown to be true or false by the evidence in the case, is erroneous, as telling the jury that they were not to look to and consider the other evidence in the case, in determining the truth or falsity of what defendant said against himself, as the law presumes that to be true. (28) It was error for the court to permit Mr. McDonald, of counsel for the state, to experiment, as he did, in the presence of the jury, and especially to make the statements of fact, accompanying and explaining said experiments, of matters not in evidence. The experiments themselves were in the nature of evidence, and were, therefore, improper, even without the accompanying misstatements of fact. *State v. Sanders*, 68 Mo. 202. (29) And it was erroneous for the court to permit Mr. Clover to state to the jury, in his final argument, that it was dishonest for appellant and his counsel not to make known to the state what his defence was prior to the trial. (30) So it was error for Mr. Clover to state to the jury that the depositions relating to defendant's character were worthless, and were only permitted by him to be read as a favor. *State v. Barham*, 82 Mo. 67; *State v. Harper*, 71 Mo. 425; *State v. Lee*, 66 Mo. 165; *State v. Mahly*, 68 Mo. 316; *State v. Reed*, 71 Mo. 200; *State v. Johnson*, 76 Mo. 121; *Ritter v. Bank*, 87 Mo. 575. (31) The court should have sustained the motion for new trial on account of the incompetency of the juror Coulahan. *State v. Musick*, 71 Mo. 401; *State v. Burnside*, 37 Mo. 343; *State v. Rush*, 77 Mo. 519; *State v. King*, 78 Mo. 555; *State v. Jaeger*, 66

The State v. Brooks.

Mo. 173; *Whitmore v. Ball*, 9 Lea [Tenn.] 35; Bill of Rights, sec. 22. (32) It was error to overrule the motion in arrest of judgment. It should have been sustained : (*a*) on the ground that the court had no jurisdiction to try the case, owing to the matters embraced in the first point above stated ; which matters are hereinafter particularly set out and discussed ; (*b*) because the third count of the indictment, by reason of the defect hereinbefore pointed out, charged a misdemeanor only, *i. e.*, a common assault, and hence there was a misjoinder of counts, and a general verdict will not support a judgment in such case. (33) The court erred in holding, as it did, that the statute, which provides that motions for new trials, in criminal cases, shall be filed within four days after a verdict, deprived the court of the right or power to permit the supplemental motion for a new trial to be filed, or the reasons assigned in that motion to be added by way of amendment to the reasons set out in the original motion, or to hear said supplemental motion, and to grant appellant a new trial of the court's own motion, provided the court should be of the opinion that appellant was entitled thereto. Bill of Rights, secs. 22, 23; Fourteenth Amendment to U. S. Const. ; *State v. Gates*, 20 Mo. 400 ; *State v. Underwood*, 57 Mo. 40 ; *Williams v. Circuit Court*, 5 Mo. 240 ; *Richmond v. Wardlaw*, 36 Mo. 313 ; *State ex rel. v. Adams*, 84 Mo. 310.

*B. G. Boone*, Attorney General, *A. C. Clover* and *C. O. Bishop* for the state.

(1) The motion to quash the indictment and other proceedings was properly overruled. The indictment is good, no point being made upon that, and could not be affected by proceedings, however informal, in the court of preliminary examination. Wharton's Crim. Prac. [8 Ed.] sec. 27, and cas. cit. ; *Ibid*, sec. 388 ; 2 R. S., p. 1512, sec. 7. The Bill of Rights (sec. 12) and

Schedule (sec. 12) do not entitle an accused person, as a matter of right, to a preliminary examination, which is "a mere expedient to prevent the suspected person from escaping, or for preserving the evidence or keeping the witnesses within control." 1 Bish. Cr. Proc. [3 Ed.] sec. 239*a*. (2) The court committed no error in not sustaining appellant's objections to cross-interrogatories propounded to witnesses in the commission. The questions thus propounded by the state were legitimate in cross-examination, sifting the witnesses who claimed a knowledge of defendant's general reputation in the community where he had lived. *State v. Brady*, 87 Mo. 142. (3) The court committed no error in overruling appellant's objection to proceeding further until a correct list of special jurors, summoned by the sheriff, was furnished to him. The errors in the lists, pointed out, were clerical mistakes in the spelling of names. The right persons had been summoned. *Praesentia corporis tollit errorem nominis.* Broom Leg. Max. 639 ; *Lincoln v. Thompson*, 75 Mo. 629 ; *State v. Mathews*, 88 Mo. 121 ; *State v. Gleason*, 88 Mo. 582. (4) The court committed no error in refusing to permit appellant to inquire of jurors on their *voir dire* as to opinions formed on mere matters of evidence. It was sufficient that jurors disclaimed bias or prejudice, and the opinions formed upon the issue to be tried, and upon the question of the guilt or innocence of the accused. R. S., sec. 1897. (5) There was no error in sustaining the state's challenges to certain jurors upon their *voir dire*. The claim that special jurors are not subject to the same grounds of objection as ordinary jurors, is as novel as it is absurd. Thom. and Mer. on Juries, sec. 100 ; *Lee v. Lee*, 71 N. C. 139 ; *McGuffie v. State*, 17 Ga. 497. (6) There was no error in overruling appellant's challenges to jurors, Knollman and Comfort, they having declared upon their *voir dire* that they had no bias or prejudice, no fixed opinion, and could try the prisoner fairly and impar-

tially. R. S., sec. 1897; *State v. Hopkirk*, 84 Mo. 278; *State v. Wilson*, 85 Mo. 134. (7) The prisoner was not denied his right to a public trial. Upon its being represented to the court during the first stages of the empaneling of the jury that persons were denied admission to the courtroom, the court declared that, if so, it was without authority, and at once ordered that every person desiring to come into the courtroom might do so. It does not appear that any person was excluded who might have been of any benefit to the accused. Cooley's Const. Lim. 312 (marginal page); 1 Bish. Crim. Proc., sec. 959. (8) The objection that state's counsel stated to jurors on their *voir dire* that "this murder occurred in the Southern Hotel," is frivolous. So, also, the objections that state's counsel asked jurors upon their *voir dire*, "can you give the accused a fair and impartial trial?" (9) The court committed no error in overruling appellant's objection to state's counsel in opening to the jury defining murder. The definition by counsel was technically exact. *State v. Robinson*, 73 Mo. 306. (10) The objections made to closing argument of the circuit attorney that "defendant had forged his father's name," is not sustained by the record. Counsel did not use any such language. Counsel have the undoubted right to draw any legitimate conclusions from the testimony. *State v. Emory*, 79 Mo. 461. Even from that of the defendant himself. *State v. Testerman*, 68 Mo. 408. (11) There was no error in regard to counsel for the state saying that he had waived informalities in the English depositions and consented to their being read. The record shows that the depositions lacked the essential certificate, and Mr. Fauntleroy's affidavit sustains the remarks of counsel, and the jury had the benefit of the allegations of both sides. (12) There was no error in permitting the testimony of the witness, McCullough, or "Dingfelder," to go to the jury. That evidence was clearly competent and admissible; its credibility was

for the jury to determine, and this the jury were told by the court's instructions. This court, and many others, has held that artifice, cunning, falsehood, and deception, used to obtain a disclosure from a prisoner, even by an officer in charge, will not render a confession, thus obtained, inadmissible in evidence, especially, as in this case, where the purported confession is corroborated by the other circumstances in evidence. *State v. Patterson,* 73 Mo. 695; *State v. Phelps,* 74 Mo. 128; *State v. Hopkirk,* 84 Mo. 278; *State v. Fredericks,* 85 Mo. 145. The authorities on this point are numerous and respectable, some going even so far as to hold that the discredit of an accomplice does not attach to a detective who joins a criminal organization for the purpose of exposing it, even though, in order to aid in such exposure, he unites in, and apparently approves its counsels. *Campbell v. Commonwealth,* 84 Pa. St. 187; *State v. McKean,* 36 Iowa, 343; all following *Rex v. Despard,* 28 Howell's St. Tr. 346. See, also, *Heldt v. State of Nebraska,* 30 N. W. Rep. 626. And in this state one who has been convicted and solemnly adjudged guilty of perjury, is not thereby rendered an incompetent witness. The testimony of the witness, "Dingfelder," as to his relation with the prisoner in the jail and his agreement with him to furnish witnesses to prove certain facts, in prisoner's behalf, is corroborated by the correspondence in evidence, concerning which counsel is strangely silent; a letter, written by the witness to prisoner, stating that his two friends, who were to testify in prisoner's behalf, would meet his attorneys at a certain day and hour, in the Laclede Hotel, to talk over the matter, and a letter in reply from the attorneys, agreeing to meet the parties at their office. (13) There was no error in refusing to compel the state to call Dr. Nidelet as a witness for the prosecution, or in permitting the state to rest its case without putting in evidence the *post mortem* examination of deceased made by him. The state is not bound to call as a

witness every person who may know something ·of the case. *State v. Eaton*, 75 Mo. 593; *State v. Johnson*, 76 Mo. 121; *State v. Anderson*, 81 Mo. 78. (14) The court committed no error in admitting testimony concerning the exhumation of deceased, and the examination of his parts by experts, without notice to defendant. *State v. Leabo*, 89 Mo. 247; *State v. Bowman*, 80 N. C. 432; *Boyle v. State*, 61 Wis. 447; Rogers Exp. Tes., sec. 14; Whar. & Stil. Med. Jur., p. 42, sec. 1247. (15) The court committed no error in refusing to make an order on the circuit attorney to submit the private parts of deceased to the defendant for examination. A trial court cannot take judicial notice, on the mere statement or request of a defendant, that the state has certain evidence in its possession which defendant is entitled to inspect. *McDonel v. State*, 90 Ind. 320–328. And even if there was error, no exception was saved at the time, and defendant will not be heard to complain. Matters of mere exception occupy the same footing and are governed by the same rules in criminal as in civil cases. Where no exceptions are saved at the time the points will not be noticed. *State v. Ray*, 53 Mo. 345; *State v. Burnett*, 81 Mo. 119; *State v. McDonald*, 85 Mo. 539; *State v. Lett*, 85 Mo. 52; *State v. Reed*, 89 Mo. 168; *State v. Burk*, 89 Mo. 635. (16) If it was error of the court to remark to the counsel for appellant that any erroneous ruling might be brought up by counsel on motion for new trial, that error was immediately corrected by the court. An indiscreet remark made by the judge during the trial, but immediately withdrawn, held not to justify interference with a judgment which the evidence supported, where it did not clearly appear that the prisoner was prejudiced. *State v. Sanders*, 76 Mo. 35; *State v. Underwood*, 76 Mo. 630. (17) It does not appear, from the record, that defendant was cross-examined as to any matters not referred to by him in his examination in chief. (18) The instructions are all in

proper form and cover all the law of the case. (*a*) Murder in the first degree is correctly defined in accordance with all the decisions. (*b*) It was not necessary to instruct specifically as to each count of the indictment, since they all charged the same offence. *State v. Hollenscheit*, 61 Mo. 302. Assuming that the third count was defective, the first and second were good, and the general verdict of guilty was good. *State v. Blan*, 69 Mo. 317. It is not necessary in such case for the verdict to specify on which count it was found. *State v. McDonald*, 85 Mo. 539 ; *State v. Miller*, 67 Mo. 604. Nor was there any repugnancy as to the manner of the killing. See instructions approved in *State v. Hollenscheit*, 61 Mo. 302 ; *State v. Leabo*, 84 Mo. 117 ; s. c., 89 Mo. 247. (*c*) The instruction as to flight was correct. The prisoner assigned no other motive for the flight than to avoid arrest and trial on the charge of killing Preller. *State v. Griffin*, 87 Mo. 608 ; *State v. King*, 78 Mo. 555 ; *State v. Mallon*, 75 Mo. 357. (*d*) The instruction as to defendant's evidence of good character was in the most approved form and most favorable to him. The objections thereto are too technical and precise. (*e*) The instruction as to the credibility of witnesses, and the test of credibility, was in the form approved in the cases of *State v. Rider*, 90 Mo. 54 ; *State v. Gee*, 85 Mo. 647 ; *State v. Wisdom*, 84 Mo. 177 ; *State v. Orr*, 64 Mo. 339. (*f*) The instruction as to reasonable doubt has been approved so often that it seems superfluous to cite authorities. Stronger phrases were endorsed in *State v. Gann*, 72 Mo. 374. See *State v. Payton*, 90 Mo. 220. (*g*) The same may be said regarding the instruction relative to statements made by the accused. *State v. Anderson*, 89 Mo. 312 ; *State v. Peak*, 85 Mo. 190. (*h*) In conclusion, the jury were told that, in arriving at their verdict, they were not to be guided by the arguments of counsel, but by the evidence in the case, and the law as given by the court. This was eminently proper and in accordance

with the principle laid down in *State v. Schoenwald*, 31 Mo. 147 ; *Hardy v. State*, 7 Mo. 607. (19) There was no error in permitting Mr. McDonald to make the experiment complained of, in the presence of the jury. The phial was the identical one in evidence, identified by the druggist, and admitted by the accused to be the one alleged to have been upset in the wash stand. Such experiments have been often approved. Wharton's Crim. Evid. [9 Ed.] secs. 312, 314 ; *People v. Morrigan*, 29 Mich. 4. *Vide* also *Buddensieck v. People*, 8 East Rep. 324. (20) There was no error in refusing to permit counsel for appellant to read to the jury, in his argument, a decision of this court. It was a matter of discretion with the court. *State v. Klinger*, 46 Mo. 224 ; *Murphy v. State*, 6 Ind. 449. (21) The question of the disqualification of the juror, Coulahan, was submitted to the trial court on affidavits *pro* and *con.*, and the finding of the court was against the appellant. This finding, being supported by evidence which it was the duty of the trial judge to consider and weigh, cannot be disturbed in the appellate court. *State v. Cook*, 84 Mo. 40 ; *State v. Gonce*, 87 Mo. 629. (22) The motion in arrest was based on the sole ground of the alleged defect in the third count in the indictment. It was properly overruled on the authority of *State v. Blan*, 69 Mo. 323. (23) The court committed no error in refusing to permit appellant to file what he calls a supplemental motion for a new trial fourteen days after the verdict was rendered. The statute requiring motions for new trial to be filed within four days after verdict has been always treated by the court as mandatory. And the same rules have been held to prevail in criminal as in civil cases. If the motion can be filed after four days, then it need not be in writing, nor set forth the grounds or causes thereof. R. S., sec. 1967. It has been held that, in civil cases, where the motion has not been filed in time, the court can only deny the motion, even if it believe error was com-

mitted during the progress of the trial. *Cattell v. Dispatch Publishing Co.*, 88 Mo. 356 ; *Bollinger v. Carrier*, 79 Mo. 318 ; *Welch v. St. Louis*, 73 Mo. 71 ; *Moran v. January*, 52 Mo. 523 ; *Exchange National Bank v. Allen*, 68 Mo. 474 ; *State v. Marshall*, 36 Mo. 400. (24) The mere remark of the circuit attorney, made in the course of the trial, that counsel for prisoner "need not expect assistance in protecting the rights of his client," seems too trivial to merit consideration.

NORTON, C. J.—The defendant was tried in the St. Louis criminal court, at its May term, 1886, on an indictment charging him with murder in the first degree, in killing one Charles Arthur Preller. He was convicted of the crime charged, and has appealed to this court from the judgment.

The record is very voluminous, and defendant's counsel, with commendable zeal, have assigned a great number of alleged errors in the conduct of the trial, the first of which is that the court erred in overruling defendant's motion to quash the indictment. The motion to quash was not based on any insufficiency of the indictment, but the court was asked to quash it on the distinct ground that, previous to the finding of the indictment, defendant had been illegally arrested, and was in custody under such arrest when it was found. Conceding (without deciding) that, previous to the finding of the indictment, the forms of law had not been pursued in arresting the defendant, and that such arrest was illegal, it affords no ground for quashing the indictment, and it has been so ruled in the following cases, and we have not been able to find a contrary ruling by any court of last resort: *People v. Rowe*, 4 Park. Crim. Cas. 253 ; *State v. Brewster*, 7 Vt. 118 ; *United States v. Lawrence*, 13 Blatch. 295 ; *Dow's case*, 18 Pa. St. 37.

In the case last cited, the prisoner had been indicted for forgery, and was afterward arrested without legal

authority, and it was held that such arrest did not entitle him to discharge before prosecution, Gibson, C. J., observing, in the disposition of the question, that "the prisoner in Brewster's case insisted that he had been kidnapped abroad, but he was held to answer. That case has not been overruled, or before doubted; and the English courts held the same doctrine. It was enforced in Susanna Scott's case; and in Mack's, as well as Kran's, case, the broad principle was established that want of authority for the prisoner's arrest cannot protect him from prosecution."

The record shows that defendant made a proper application, under section 1, Acts 1885, page 74, for a special jury, and that the court made an order directing the jury commissioner to provide the sheriff with a list of the names of three hundred persons to be summoned; that a list of such names was furnished to the sheriff, and that, of the number, about two hundred were summoned, and the others were returned not served; that a list of the names of those summoned, with a list of the names of those not summoned, was furnished defendant's counsel; that, when the name of Harry Picker was called, one Harry Vicker answered; when the name of Ernest Gahl was called, a man responded and said that his name was Ernest Gaier, and when the name of William Richardson was called, a man came forward and stated that his name was William Riches. Defendant's counsel objected to the list furnished, as not being correct, and objected to proceeding further until a corrected list was furnished. The court overruled the objection, and we think properly.

In case of *Rex v. Mellor*, 27 L. J. Mag. Cas. 143, where a juror was addressed by and answered to the wrong name, and was afterwards sworn, upon a case reserved, the court said: "The mistake is not a mistake of the man, but only of his name. * * * At bottom, the objection is but this—that the officer of the court,

the juryman being present, called and addressed him by a wrong name. Now, it is an old and familiar maxim of law that, when a party to a transaction, or the subject of a transaction, are either of them present, the calling of either by a wrong name is immaterial. *Praesentia corporis tollit errorem nominis.*"

It is also objected that defendant did not have a public trial. This claim is based upon the fact that, during the early stages of empaneling the jury, two men were stationed on the afternoon of one day and the forenoon of the next day at the door of the courtroom, who refused to admit any one into the courtroom except jurors, witnesses, or officers of the court, or those having business in court. It appears that, when this matter was brought to the attention of the court, the court stated that no order had been made stationing men at said door, and announced that any one who wished to come into the courtroom could do so, and made an order that all persons be admitted until all the seats were filled. Had the court either refused to make such an order, or if, after making it, had refused a request on the part of the defendant that the jurors who had been examined touching their qualifications, while the men were stationed at the door, should be reëxamined, this might have afforded some ground for the complaint made ; but no such a request was made.

"Publicity does not absolutely forbid all temporary shutting of doors, or render incompetent a witness who cannot be heard by the largest audience, or require a courtroom of dimensions adequate to the accommodation of all desirous of attending a notorious trial. * * * 'And the requirement is fairly met if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those whose presence would be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are

excluded altogether.' Cooley Const. Lim., top p. 380, side p. 312." Bish. Crim. Proc., sec. 859.

During the examination of the jurors on their *voir dire*, jurors Bauer and Bauman, after each of them had stated that he had formed an opinion based on newspaper reports, were asked whether, if sworn as jurors, they could give the accused a fair and impartial trial; this question was objected to on the ground that it was an attempt to have the juror state which way his opinion was, and we think the objection was properly overruled, the object of the question being to ascertain whether the jurors, notwithstanding the opinions they had formed, could try the case impartially. Certain other jurors were, among other things, asked: "Did you, from what you read of the case, form or express any opinion as to whether this man, whose body was found in the trunk at the Southern Hotel, was killed or not?" "Did you form any opinion as to whether C. Arthur Preller was killed or not? or form any opinion as to whether or not chloroform was administered to him? or whether, if dead, he was killed intentionally or accidentally?"

It appearing that the jurors to whom these questions were propounded had been fully examined as to the opinions formed by them on the issue to be tried, and as to the guilt or innocence of the accused, and as to their bias and prejudice, we cannot say that it was an unsound exercise of discretion by the trial judge in imposing a limit to such examination by sustaining objections to the questions asked, especially so in view of the fact that the line of interrogation indicated by the questions put, if permitted, would tend to make such examinations interminable, without any corresponding beneficial results.

The action of the court is also excepted to in sustaining the state's challenge to one juror who was under the age of twenty-one years; to another who was over the age of sixty-five years; to another who was not a citizen of the state; to another who was not a resident

of the city of St. Louis. The action of the court in this respect is justified by sections 2777-9, Revised Statutes.

No error was committed in sustaining the state's challenge to juror Rich, who, after stating that he had formed an opinion from what he had read, was asked whether, notwithstanding the opinion he had formed, he could give the accused a fair and impartial trial, to which he replied: "That is very doubtful." If this juror had been accepted, we, doubtless, would have been requested to reverse the judgment, on the ground that the court had accepted a juror who not only stated that it was doubtful whether, if accepted, he could give the accused a fair trial, but that it was very doubtful.

Nor was there, under the ruling of this court in the case of *State v. Walton*, 74 Mo. 271, any error committed in refusing to sustain the challenge of the defendant to jurors Knollman and Comfort, each of whom, in effect, stated that, although he had formed an opinion from reports, which it would require evidence to remove, he could try the case fairly and impartially, on the law and the evidence. "The rule is well settled that it is the duty of the court to superintend the selection of the jury, in order that it may be composed of fit persons. Large discretion must be confided to the trial court in the performance of this duty. Nor will the action of the court in this behalf be made the subject of review unless some violation of law is involved, or the exercise of a gross and injurious discretion is shown. * * * It is sufficient that the judge is satisfied, from his personal knowledge of the jurors; their answers to other questions; their reputation for integrity and intelligence, and his judgment in respect to such qualifications will not be reviewed." Thomp. & Mer. on Juries, sec. 258.

What is approvingly quoted in the case of *State v. Walton, supra*, may be repeated here, that the issue presented, as to whether an opinion formed by a juror is of such character as necessarily to raise the presumption

of partiality, is to be tried, so far as the fact is concerned, upon the evidence; and the finding of the trial court on that issue ought not to be set aside by a reviewing court, unless the error is manifest. No less stringent rules should be applied by the reviewing court than those which govern in the consideration of motions for new trials because the verdict is against the evidence. In such cases the manner of the juror while testifying is oftentimes more indicative of the character of the opinion than his words. That is seen below, but cannot be on the record.

On the trial, the court, against defendant's objection, allowed one J. F. McCullough to testify as to a confession of defendant. It is insisted that error was committed in receiving this evidence, because the confession was not voluntary, and because the witness by whom it was proposed to prove it was incompetent, for the reason that said McCullough, who was a detective, with the connivance of the circuit attorney and his assistant, had himself arrested on a fictitious charge of forgery, under the name of Dingfelder; that he waived preliminary examination, and was indicted by the grand jury on the evidence of witnesses testifying before them to facts supposed by them to be true, but known to all who connived at his arrest to be false; that to this indictment he pleaded not guilty, and was confined under the charge forty-seven days in jail, with a view of obtaining a confession from defendant, and that it was during this confinement that the confession received in evidence was made.

It appears from the record that Dingfelder, while being thus confined, ingratiated himself in the confidence of the defendant, informed him of the charge on which he was confined, and stated he was connected with a gang of forgers and lawless men; that, in the interview had between them, defendant said: "If I could get a witness to testify to anything like that, I could beat the

state easily." "I asked him what way, what he meant by it. He said: 'If I could get witnesses to testify that I had so much money on leaving Boston, I could beat the state—that is the missing link in my case. I would give anything if I could get two witnesses to testify to that.'" Witness asked him what he wanted the two witnesses to testify to. He said he wanted them to testify he had so much money on leaving Boston; that he had seven or eight hundred dollars. Witness then said: "I would have to have the particulars of your case, and what you done in Boston, so that these people could act intelligently in regard to testifying for you." He then went on, and after stating the time he arrived in Boston, what he had done there, what time Preller left Boston, and full particulars, he made the statements offered in evidence as his confession. The objection that the confession thus made was not voluntary is not well taken, under the rulings made in the cases of *State v. Patterson*, 73 Mo. 695 ; *State v. Phelps*, 74 Mo. 128 ; *State v. Hopkirk*, 84 Mo. 278.

It is further insisted that, owing to the methods resorted to to obtain the confession, it was error to receive it in evidence. While the officers whose duty it was to prosecute criminal offences, may, in their anxiety to ferret out the circumstances concerning the death of Preller, have overstepped the bounds of propriety in the course pursued by them, which is not to be commended, but condemned, it affords no legal reason for rejecting the evidence and not letting it go to the jury whose peculiar province it was to pass upon the credibility of the witness who detailed the confession and give to it such weight as, under the circumstances, they believed it entitled to. It was for the court to say what evidence should be received and for the jury to say what weight it should have when received.

While the fact that artifice and deceit were resorted

to in obtaining the confession might properly be considered as affecting the credibility of the witness, it did not render him incompetent as a witness, and this has been so ruled in the following cases : *State v. Patterson*, 73 Mo. 695 ; *State v. Phelps*, 74 Mo. 128. In the case last cited it is said : " There is one particular in which this case differs from *Patterson's case*, and that is, here the officers in charge of the prisoner asked questions and used artifices, cunning, falsehood, and deception to obtain a disclosure from the prisoner. But no law is better settled than that such practice will not render inadmissible a confession obtained by such means." To the cases cited in the opinion in support of the proposition therein stated, the following may be added : *State v. McKean*, 36 Iowa, 343 ; *Campbell v. Commonwealth*, 84 Pa. St. 187 ; *Hickey v. State*, 12 Neb. 490.

It appears from the record that, on Saturday, the twenty-ninth of May, during the progress of the trial, counsel for defendant called the attention of the court to the fact that the state had, without notice to defendant, caused the body of Preller to be exhumed and requested the prosecution that, some time during the day, the defence be allowed to use this evidence and to have experts examine the parts of the body. In response to this request, the state attorney said in effect that the body of Preller had been exhumed, and the parts removed from it had been entrusted to eminent surgeons for examination, and that the state expected to offer the result of that examination in evidence by way of rebuttal, and for that reason declined compliance with the request, whereupon, the court used the following language : " Of course, the court knows nothing of this matter, and I can only say the way it strikes the court now. Of course, if such testimony as that is presented in rebuttal * * * the court will give you all the facilities in reason that it can, in order to get experts, if you desire to examine and look into it. * * * At

present, of course, I must simply look at the evidence as it is presented. If you are taken by surprise at that time, why the court will endeavor to assist you as far as it can, and give you sufficient time to examine it. That is the best I can do for you now."

Mr. Fauntleroy, of defendant's counsel, then said in substance that the law required that such examination could only be made by the state on due notice to the defendant. In reply to which the court said : "I will hear you on that when you produce your authorities. Produce your authorities and I will hear you now. When this matter comes up I will pass upon it. It would not be proper for me to comment on anything, because there is nothing before me."

Mr. Fauntleroy then said : "The state declines that request—refuses it. Now we ask that the court make an order that we be permitted by experts to examine the parts." In response to which the court said : "I cannot do so at present. I don't know what I may do on Monday." To this action defendant excepted, and announced that the defence rested.

There is nothing in what is above quoted indicating any other purpose on the part of the court than a desire to be informed on the question of law raised by counsel as to the necessity of notice of the exhumation and examination of Preller's body, and authorities upon the point not being produced, no error was committed by the court in putting the matter over till Monday, at which time defendant again raised the point as to necessity of notice, when the state offered in rebuttal the result of the expert examination of the parts removed from the body, which was properly overruled, on the authority of *State v. Leabo*, 89 Mo. 247, where it is expressly held that the evidence of medical experts, as to the condition in which they found the body of the deceased on a second *post-mortem* examination, is not

inadmissible because such examination was made without notice to the defendant.

After the introduction of this evidence in rebuttal and the state had closed its case, the following colloquy between counsel occurred, as shown by the bill of exceptions:

Mr. Fauntleroy: "We would now ask that we be permitted, through experts, to examine these parts that have been referred to in this matter."

Mr. Clover: "Well, who do you want to submit them to?"

Mr. Fauntleroy: "To Dr. Bauer and others."

Mr. Clover: "I want to know to whom they are to be entrusted, because I have that evidence. I want to know to whom they are to be entrusted. We want them to furnish the names."

Mr. Fauntleroy: "Well, we name Dr. Bauer for one."

Mr. Clover: "I am willing to submit them to any reputable physician in the city of St. Louis, but I don't wish to submit them to Dr. Bauer; not because I question his reputability, but because he is assisting the defence and has suggested questions to the counsel when medical experts were on the stand; but if they say they will submit them to Dr. Gregory, President of the American Association of Physicians and Surgeons, to Dr. Mudd, or to Dr. Timelake, or any other physician, they can have ample opportunity to do it."

Mr. Fauntleroy: "Without furnishing the names of any physicians, we ask that they submit these parts to the inspection of Dr. Bauer and such other reputable physicians as we may see fit."

It was then remarked by the court: "There is the circuit attorney. They are not before the court and have never been before the court."

Mr. Fauntleroy: "I understand that that request is to be complied with."

Mr. Clover: "I have nothing to say, Mr. Fauntleroy."

Whereupon Mr. Fauntleroy replied: "If the state, your honor, takes that attitude, we close the case here." And both sides rested.

The question as to whether error was committed in what was said and done as above detailed, is not before us for determination, inasmuch as the record does not show that any exception was taken or saved at the time. *State v. Burk*, 89 Mo. 635; *State v. Ray*, 53 Mo. 345; *State v. Lett*, 85 Mo. 52.

It is further insisted that error was committed in allowing defendant to be cross-examined as to matters not referred to by him in his examination in chief. The examination in chief of defendant covers about eighty pages of legal-cap paper in type-writing, and his cross-examination, including controversies between counsel during the continuance, was quite as extensive, and it would serve no useful purpose to incorporate in this opinion, in minute detail, the various matters testified to by defendant in his direct and cross-examination, and we feel justified, after thorough investigation, in simply announcing the conclusions arrived at, and the principles of law relied upon, in reaching the conclusion. It is provided by statute (R. S., sec. 1918), when a defendant in a criminal case offers himself as a witness, that "he shall be liable to cross-examination as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness." In the case of *State v. Palmer*, 88 Mo. 568, it is held that, while a defendant can only be cross-examined as to the matters referred to in his examination in chief, that the same rules and tests, with that exception applicable to the contradiction and impeachment of other witnesses, also apply to him, and in the case of *State v. Beaucleigh*, *ante* p. 490, it is held that, even though a defendant may be cross-examined as to a matter not referred to

in his examination in chief, if such cross-examination relates to matters of no importance, and which could not affect the verdict, such error affords no ground for reversing the judgment. Guided by these rules, we have reached the conclusion that they have not been violated in the cross-examination of the defendant, inasmuch as he had either referred to the matter inquired about in his examination in chief, or the matter inquired about was contradictory of what he had stated in his examination in chief, or the matter inquired about was trivial and unimportant and having no prejudicial bearing on the case.

As examples of the objections made to the cross-examination, the following may be referred to: Defendant was asked: "What reason had you for telling Mr. Warren that your father was dead, if he was alive? Did you tell Mr. Warren that you expected, on your father's death, to inherit a considerable property? Didn't you, in your early conversations with Mr. Preller, in the early part of your acquaintance, tell him that you had friends in London?" Objections to these questions were overruled, and, we think, properly. In his direct examination, he had testified to conversations with Preller, and had also testified that his father was living at the time of the trial, and also that he had conversations with Warren on board the ship which brought him to this country, and conversations and correspondence after he came. On his cross-examination, defendant was asked whether the following paper, which the state had put in evidence in their case in chief, was in his handwriting, viz.:

"The Royal College of Surgeons, London, incorporated A. D. 1416. Diploma: Be it remembered, That, in the day and year hereunder written, Walter Horace Lennox-Maxwell, of the city of London, was duly admitted to be a member of the Royal College of Surgeons, London, it having been first certified, under the

hands and seals of the council of medical education, that he hath complied with the requirements, and hath made, taken, and subscribed to declaration and affidavits, as provided by the charter of the college.

"Given under my hand, this 14th day of May, in the year of our Lord."

The question was objected to and the objection overruled, and the paper having been read to the jury by the state in its case in chief, was, over the defendant's objection, again read, for the purpose of examining defendant in relation thereto, and he was asked if it was a diploma of the Royal College of Surgery, London, and when he obtained possession of it, and for what purpose he wrote it; all of which questions were objected to. The defendant, in his direct examination, had stated that he had never had a diploma; had never been licensed as a physician, and had never represented himself to be a regular physician. In view of these statements, it was competent to inquire of him if he had not, either orally or in writing, represented himself to be a member of the Royal College of Surgeons, London.

The second instruction given by the court is objected to on several grounds, the first of which is that as the third count of the indictment is defective, in not charging that defendant did deprive Charles Arthur Preller of life, that the court committed error by supplying this omission in the instruction, telling the jury that said count did charge the defendant with depriving said Preller of life, and in further telling them that if they believed defendant did kill and murder Charles Arthur Preller, in manner and form charged in either count of the indictment, they should find him guilty of murder in the first degree. The third count of the indictment is defective in the particular specified in the objection, and but for the ruling of this court, in the cases of *State v. Hollenscheit*, 61 Mo. 302; *State v. Blan*, 69 Mo. 317;

*State v. McDonald*, 85 Mo. 539; *State v. Miller*, 67 Mo. 604, the point made would be well taken.

In the first case above cited, it is held that where an indictment contains more than one count charging only a single offence, and of the same degree, merely varying the statement as to the crime charged to meet the evidence, the court need not charge separately as to each count, but may, in one instruction, refer to them all, and tell the jury to render a verdict of guilty, if they find the accused committed the crime in the manner charged in the indictment; and in the case of *State v. Blan*, *supra*, where the indictment contained five counts for murder in the first degree, three of which were bad and two good, the judgment of conviction was upheld, although the court had given an instruction to the effect that if the jury found that the accused feloniously, wilfully, deliberately, premeditatedly and with malice aforethought killed the deceased in some one of the modes described in the indictment, they would find him guilty of murder in the first degree. In the cases of *State v. McDonald* and *State v. Miller*, *supra*, it is held that a general finding of guilty, on an indictment containing several counts relating to the same offence, is sufficient without specifying the count on which the verdict is based.

In the instruction complained of, the court told the jury that if they believed from the evidence that the defendant did "kill and murder Charles Arthur Preller, in the manner and form charged in either of the counts of the indictment, they should find the defendant guilty of murder in the first degree." It is insisted that this instruction is erroneous, because the court did not insert, before the words "kill and murder," the words "wilfully, deliberately, premeditatedly, and with malice aforethought." This point is not well taken, inasmuch as the court, in a previous part of the instructions, had fully explained to the jury that the indictment not only set forth the means and modes used by defendant in

killing Preller, but that it also charged him with killing Preller by these means, feloniously, wilfully, deliberately, premeditatedly, and with malice aforethought, and inasmuch as the jury were required by the instruction to find that the killing was done not only in the manner, but also in the form charged by the indictment. Neither is there any force in the objection made to the use, in the instruction, of the word murder, without explaining the meaning, inasmuch as it was only necessary for the jury to find that the accused did kill the deceased, as charged in the indictment, and this the instructions required them to find.

Neither is there any force in the objections to the following instruction: "Flight raises the presumption of guilt, and if the jury believe and find, from the evidence, that the defendant, after the commission of the homicide alleged in the indictment, fled from the state of Missouri, and tried to avoid arrest and trial for said offence, they may take this fact into consideration, in determining his guilt or innocence. The court instructs the jury that, although they may believe and find from the evidence, that the defendant fled from the state of Missouri, after the commission of the homicide alleged in this indictment, yet, if they believe and find, from the evidence, that he did not flee from a motive to avoid arrest and trial on this charge, they should not consider it as an element in arriving at their verdict as to defendant's guilt or innocence of this charge."

The defendant, on his examination, on being asked what he did after he found that Preller was dead, answered as follows: "My first impulse was to communicate with the authorities. The next thought that struck me was, 'well, here I am a stranger in a strange city; I know no one here'; I was totally ignorant of the fact that I might testify in my own behalf. I was ignorant that the same rule of law did not prevail here that prevails in England, that a defendant cannot testify in his own

behalf, and I thought the best thing I could do was to get away." This statement justified the court in giving the instruction, and it is as favorable to defendant as the facts warranted. *State v. Martin*, 5 Mo. 361; *State v. King*, 78 Mo. 555; *State v. Griffin*, 87 Mo. 608.

All the instructions given appear in the report of the case, and as to those of them objected to and not specially noticed in this opinion, it may be said that they are such as have been repeatedly approved by this court except the last one in the series, and of this it may be said that it was neither misleading nor confusing, but, on the contrary, emphasized the fact that the jury in reaching a verdict should be guided alone by the evidence and instructions in the case. While the instruction as to robbery is subject to verbal criticism it could not have misled the jury when applied to the facts in evidence, it appearing from defendant's own evidence that he took Preller's money after he had brought about his death.

The following authorities establish the proposition that an extra-judicial confession, uncorroborated and without proof *aliunde* that the crime had been committed, will not justify a conviction. *Robinson v. State*, 12 Mo. 592; *State v. Scott*, 39 Mo. 424; *State v. German*, 54 Mo. 526; *State v. Patterson*, 73 Mo. 695. In the first case above cited, there was no proof of the *corpus delicti*, and the judgment was reversed because of the court refusing to give an instruction asked by defendant, to the effect that an extra-judicial confession was not sufficient to convict unless corroborated and the crime proved to have been committed by other evidence. In the case before us, there is corroborative evidence, and also other evidence proving the *corpus delicti*. We do not understand that counsel dispute this, but to insist that it was the duty of the court, though not requested, as in the case of *Robinson v. State, supra*, to give such an instruction as was refused in that case, and that its failure to do so is reversible error, and in

support of this contention we have been cited to several cases, of which the case of *State v. Branstetter*, 65 Mo. 149, is a representative. That case has been criticised and explained, in the case of the *State v. Kilgore*, 70 Mo. 558, where it is said, "The witnesses for the state, offered to contradict Mrs. Railey, testified to certain statements made by her in conflict with her evidence, substantially to the effect that she did not see the difficulty, but heard the shots, and soon after defendant came to the house with a shotgun in his hand and said he had killed Willingham. The defendant's counsel now contend, although they asked no instruction on the subject, that it was the duty of the court of its own motion to instruct the jury that the declarations of Mrs. Railey were only admitted for the purpose of impeachment and were not to be regarded by them as evidence for any other purpose. In *State v. Branstetter*, 65 Mo. 149, it was held to be the duty of the court to declare the law applicable to every crime or grade of crime of which, under the evidence, the jury might convict the accused. As to collateral matters it is for the respective parties to ask such instructions as they may be entitled to." If the instruction in this case had been asked, "it should have been given, or if one objectionable in its phraseology had been asked and refused the court should have given a proper instruction on the subject, but the *Branstetter case* carries the doctrine far enough and it cannot be extended without serious detriment to the administration of the criminal law." In the case of *State v. Clump*, 16 Mo. 385, where the court refused to give an instruction asked by defendant, telling the jury that they should receive the evidence, meaning the verbal confessions of defendant, with great caution, this was assigned for error, and in passing on the question it is said : "This court will not reverse for refusing such instruction in civil or criminal cases."

It is also insisted that the judgment should be re-

versed because of certain remarks made by the prosecuting counsel in his closing argument to the jury, to the effect that "defendant had left Hyde a thief, and that when the Cephalonia, [a vessel on which defendant and deceased came to this country], left the shores of England from the piers of Liverpool, it had on board a man by the name of W. H. Lennox-Maxwell, who was a liar, a thief and a forger." These remarks were objected to on the ground that there was no evidence to that effect. The evidence shows that defendant left England under an assumed name ; that he left with magic lanterns, the property of another, which he offered to sell in St. Louis to raise money for his own use, and in answer to the question under what circumstances he procured them, gave no other explanation than to say they were not his, and belonged to one Dr. Sidebottom. The evidence also tended to show that he had in his possession a document, unsigned, written by himself, purporting to be a diploma graduating him as a member of the Royal College of Surgeons, London, under his assumed name. It is apparent from the record that what was said by the attorney was in reply to what had been said by counsel for the defence as to the good character of defendant, and it was legitimate for counsel to comment on the facts in evidence and deduce therefrom such conclusions as they might warrant, and while the license may have been pushed beyond the line of propriety, in view of what is said in the case of *State v. Zumbunson*, 86 Mo. 111, and *State v. Emory*, 79 Mo. 461, it is not sufficient to justify an interference with the judgment.

It appears that counsel for the state had argued that the depositions as to the good character of the defendant were of no value by reason of their negative character, and that, in replying to this, Mr. Fauntleroy, of counsel for defendant, offered to read to the jury certain passages from 68 Missouri Reports, page 27, to the effect that the reputation of a person whose character is in question

may be proved by a witness living in his neighborhood, although he may never have heard it discussed or questioned. This the court refused to permit, and we will not say that the discretion of the court was unsoundly exercised, especially so in view of the fact that if the jury had not been sufficiently instructed on that point counsel should have asked the court for further instructions, and of the further fact that the practice of reading from law books to the jury is one not to be commended.

It is also insisted that error was committed in allowing the state attorney to say, in his closing argument: "If the defence had acted honestly, uprightly, and fairly with the state, the state would not have presented testimony that it has done, being in ignorance of the defence they were to establish." It is apparent, from the record before us, that counsel for defendant had indulged in denunciation of the attorneys for the state, in the management of their side of the case, and the judge trying the case, having heard what was said, was in a better position than we are to determine whether he should interfere, and to what extent, in moderating remarks made in response to assaults provoking them. In closing this branch of the case, it may be said that, until within a recent period, this court was never called upon to interfere, and asked to reverse a judgment, for such causes as we have been last considering, and then the practice is one, the growth of which ought not to be encouraged.

Another ground alleged in the motion for new trial is that Coulahan, one of the jurors who tried the case, concealed, in his *voir dire* examination, the fact alleged in the motion that he had previously formed and expressed an opinion hostile to the defendant, which he did not disclose on such examination. One Meilert, in his affidavit, stated that, in August, 1885, in the office of Justice Cronin, he had heard Coulahan say, "that the

d—d scoundrel [Maxwell] ought to be hung, and I would like to hang him." One Friese stated, in his affidavit, that in the morgue, on the nineteenth of August, 1885, he heard Coulahan "denounce Maxwell in very strong language, but couldn't give the exact words." It was stated in the affidavit of one Bradshaw that, prior to the trial, he heard Coulahan, in his (affiant's) paint-shop, say that hanging was too good for Maxwell. In the affidavit of Flood, it is stated that, some time in the month of August, 1885, he heard Coulahan say : "Maxwell ought to be hung, and I would like to help hang him, and would like to make the rope that would hang him." Coulahan, the juror, filed his affidavit, denying, in the most positive and emphatic terms, that he had ever had any such conversations as these affiants imputed to him, and averred that he had, at no time, expressed any opinion as to the guilt or innocence of Maxwell ; that the answers made by him on his *voir dire* examination were true, and that, when sworn, he had no prejudice, bias, or feeling in the case. The reputation of Coulahan for integrity and truth was established by five witnesses, while that of Friese was shown, by four witnesses, to be bad ; that of Flood to be bad by two, and that of Meilert to be bad by one, who stated that he would not believe him on oath. The defence filed the affidavits of ten witnesses, who testified that the characters of both Friese and Flood for truth were good, and seven that Meilert's character for truth was good. It does not appear that any two of the affidavits refer to the same conversation with Coulahan, in which the language imputed to him was used, thus leaving the oath of Coulahan, whose character for truth was established by five witnesses, opposed to the oath of Friese, Flood, and Meilert, each of whom had been partially impeached as credible witnesses, and the court, in this view of it, if for no other reason, was justified, under our ruling in the following cases, in holding that the

The State v. Brooks.

charge against the juror was not proved : *State v. Gonce*, 87 Mo. 627 ; *State v. Cook*, 84 Mo. 40 ; *Morgan v. Ross*, 74 Mo. 318.

It also appears that defendant, having filed his motion for new trial within the time prescribed by law, thereafter, and fourteen days after the rendition of the verdict, asked leave of the court to file what is denominated a supplemental motion for new trial, which the court refused, and this is also assigned for error. It is provided by section 1967 that "motions for a new trial shall be filed before judgment and within four days after the return of the verdict." This statute is mandatory, and, according to the uniform ruling of this court since the case of *Allen v. Brown*, 5 Mo. 323, a refusal to grant a new trial on a motion made more than four days after the trial is not error, and it has been further held that, unless it affirmatively appears by the record that the motion for a new trial was filed within four days after trial, this court will not consider the question it presents. *Welsh v. St. Louis*, 73 Mo. 71 ; *Moran v. January*, 52 Mo. 523, and cas. cit. In the case of *State v. Marshall*, 36 Mo. 400, where defendant was convicted of murder in the first degree, it is said : "No exceptions will be noticed here where no motion for a new trial has been made, or what is the same thing, where none is made and filed within the time prescribed by law." If authority is to be found putting it in the discretion of the court to authorize the filing of a supplemental motion for new trial, in view of the time the court gave defendant to make proof of the matter set up in the motion, which was filed in time, and in view of the length of time consumed in the trial, we would be unwilling to say that the court exercised its discretion arbitrarily in refusing such an application.

It is sufficient to say of other errors assigned, though examined and considered, that they will not be specifically noticed, because they rest on no better foundation

than those specially referred to in this opinion. We find that no right of defendant, either under the constitution of this state or of the United States, has been denied him, and, having carefully examined the record without finding reversible error, the judgment is hereby affirmed, with the concurrence of the other judges, except Sherwood, J., who dissents.

SHERWOOD, J., DISSENTING.—Unable to agree to a portion of the foregoing opinion, I will briefly give the reasons for my dissent:

I.  My first point for discussion will be the failure of the trial court to give an instruction relative to the alleged extra-judicial confession of the defendant. At an early day in this state, when discussing the duty of a court in this regard, it was said, "it is the duty of the judge of a criminal court, as well as any other court of record, to instruct the jury in all the law arising in the case." *Hardy v. State*, 7 Mo. 608. This was in 1842. In 1845, when regulating the practice and proceedings in criminal cases, the legislature saw fit to enact the following:  "The court shall not, on the trial of the issue on any indictment, sum up or comment upon the evidence, or charge the jury as to matters of fact, unless requested so to do by the prosecuting attorney, and the defendant, or his counsel, but the court may instruct the jury on any point of law arising in the cause, which instruction shall be in writing, unless the prosecuting attorney and defendant consent to its being given orally." R. S., 1845, p. 882, sec. 28. This section of the statute has remained on the statute book ever since. 2 R. S., 1855, p. 1195, sec. 31; G. S., 1865, p. 851, sec. 30 ; R. S., 1879, sec. 1920.

In *Couley v. State*, 12 Mo. 462, the judgment was reversed.  The court refused to give proper instructions asked by defendant in relation to extra-judicial confessions, and gave, of its own motion, improper instructions

to the jury. The judgment was reversed for the latter error. But the clear intimation is given in that case that the judgment would not have been reversed for the failure to give proper instructions when asked by defendant.

This was in 1849, and no allusion was made to the statute in such cases already referred to. In *State v. Mathews*, 20 Mo. 55, it was ruled : "It was the duty of the court to instruct the jury as to the law of the case. The instructions asked by the defendant's counsel may have been objectionable in their phraseology, but the court should not, therefore, have neglected to give such as the law of the case required." This was in 1854, and no allusion is made to the statute, and the opinion was written by Judge Ryland, who wrote the opinion in *Couley v. State, supra*, and had also written the opinion in *State v. Clump*, 16 Mo. 385, cited in the majority opinion. In *State v. Schoenwald*, 31 Mo. 147, the case of *Hardy v. State, supra*, was cited, with approval, and the doctrine therein stated was reiterated in express terms, but still no allusion was made to the statute. This was in 1860, and the opinion was written by Judge Scott, that sturdy defender of right and invincible hater of wrong, who was on the bench with Ryland, J., when the case of *State v. Mathews, supra*, was decided.

In the section already quoted I construe the words, "may instruct," etc., as meaning " shall instruct," etc., as this is the invariable rule respecting matters which relate to powers bestowed on public officers, that such powers shall be exercised in a manner promotive of justice and the public good. And what more promotive of such ends than that the juries of this state in criminal cases, charged with the issues of life and death, be properly instructed in all the law of the case? In *State v. Jones*, 61 Mo. 232, the cases cited in 7, 20, and 31 Mo., *supra*, were cited with approval, and it was there laid

down that it was the duty of the trial courts, if the law of the case is not fully declared in the instructions asked, of its own motion, to prepare those which will exhibit to the jury all the law which has any bearing on the facts established by the testimony. This was in 1875.

In *State v. Stonum*, 62 Mo. 596, when no instructions were asked by defendant, Wagner, J., said: "In *State v. Mathews*, 20 Mo. 55, it was expressly adjudged that it is the duty of the court in all criminal cases to instruct the jury as to the law ; that if the instructions offered are objectionable, the court should proceed to give such as the law requires." Aside from this being binding authority, we think it is sustained by good reason. Juries should not be allowed to guess at the law in such cases. The court should instruct them as to their duties, and as to the law in the case. This was in 1876.

In *State v. Branstetter*, 65 Mo. 149, the cases mentioned in 20, 61, 62 Mo., *supra*, are cited with approval, and a quotation made from the case last referred to, and the law, as already declared, again laid down. This was in 1877. In *State v. Kilgore*, 70 Mo. 546, the *Branstetter case* was so qualified as to exclude "collateral matters." This was in 1879. The legislature of that year, having doubtless noticed the occasional aberrations from the true path of adjudication, as established in 7, 20, 31, 61, 62 and 65 Mo., *supra*, enacted an entirely new section, as follows : ' "The court must instruct the jury, in writing, upon all questions of law, arising in the case, which are necessary for their information in giving their verdict." R. S., 1879, sec. 1908. This section, it will be observed, uses substantially the same language used by Judge Tompkins in *Hardy v. State*, *supra*, already quoted. The language of Judge Tompkins is: "It is the duty of the judge of the criminal court to instruct the jury * * * in all the law arising in the case." The language of the statute is : "Courts must instruct the jury

The State v. Brooks.

in writing upon all questions of law arising in the case," and then, in order that there might be no mistake about it, the significant words are added, "which are necessary for their information in giving their verdict."

If we are to obey this section, I cannot see how we are to escape our duty in condemning as erroneous the failure of the trial court to give an instruction in relation to the insufficiency of extra-judicial confessions alone to warrant a conviction. The law is well settled in this country that, when uncorroborated, such confessions are wholly insufficient. *State v. Patterson*, 73 Mo. 695; Wharton's Crim. Evid., sec. 633. *Aliunde* such confessions, there must be proof of the *corpus delicti*, and this involves two points to be proved. First, the criminal act charged; second, the defendant's agency in the production of the act. *State v. Dickson*, 78 Mo. 438; Whar. Crim. Evid., sec. 325; 1 Whar. Crim. Law, sec. 311. Is it necessary to put the query: Did the jury need any information on this branch of the criminal law? If the question being discussed was one of law, arising in the case, and "necessary for their information in giving their verdict," the instruction on that question of law was imperatively demanded by the express terms of the statute. So that the only inquiry to be made is, is the statute to be obeyed? Its meaning, whether we consider the plain words in which that meaning is couched, or whether the statutory or judicial history aforesaid, cannot be gainsaid, and the legislature must be presumed conversant with that history. Moreover, as was well known, that section was drawn either by, or else at the suggestion of an author of a work on the subject of criminal law, and then a *nisi prius* judge, who was in attendance at the revising session of the legislature of 1879, at their request. Oddly enough, this statute has never been alluded to in opinions heretofore rendered. Nor is it even so much as referred to in the majority opinion, though cited in the brief of

counsel. Sometimes this court has hugged criminal statutes very closely, and unflinchingly enforced them, whose constitutionality was very questionable, indeed, even when their operation was repugnant to common law and common right—nay, more, to liberty and life; and certainly a statute ought to be enforced when, like the one here before us, its provisions are *in favorem vitæ*, requiring the court to inform the jury on all the law arising in the case.

But aside from the statute, this court, in a number of decisions in addition to those named, has repeatedly affirmed it to be the duty of the trial court to instruct the jury in criminal cases, covering the whole law arising on the facts, whether such instructions be asked or not, and surely if it be the duty of the court to instruct as to the law of the case, that cannot be abdicated by reason of any failure of asking that such duty be performed. Partial and half-way instructions to a jury may frequently, and generally will, result in misinforming and misleading them as to their duty in giving their verdict, as much so as instructions wholly erroneous, or failing altogether to instruct them. I now give some cases in which this court, in more recent instances, has reiterated the doctrine of the duty of the trial court in this regard: Thus, in *State v. Banks*, 73 Mo. 592, this court said: "It is the duty of the trial court, in criminal cases, as we have repeatedly ruled, to give correct instructions, covering the whole law arising on the facts, whether such instructions be asked or not." In the later case of *State v. Palmer*, 88 Mo. 568, the same doctrine was reiterated in briefer terms. In consequence of the foregoing, the counsel of defendant were entitled, as of right, to rely, in all confidence, on both the rulings of this court, so frequently reiterated, as well as on the express mandate of the law, that "the court must instruct the jury, in writing, upon all questions of law arising in the case, which are necessary for their information in

giving their verdict." If this statute is not meaningless, if its commands are to be respected, if, on the question of law in relation to extra-judicial confessions, the jury needed information in making up their verdict, then the conclusion follows, with resistless force, that palpable error was committed in failing to instruct them on that point.

II. My second point is this: The alleged extra-judicial confession of the defendant was proved by Dingfelder. When the report of this case appears on the face of our reports, I desire that the substance of the whole transaction which led to his sham arrest, indictment, and incarceration, on false testimony and on a false charge, in order to obtain a confession from the defendant, together with all the means employed to that end, as well as the testimony as to the alleged confession, be preserved. It is no objection to the confession, of course, if obtained by falsehood, deception, trick, or artifice, and I have nothing to say on that point; but I do have this to say: that, considering the circumstances in which that confession is said to have been obtained, the witness, Dingfelder, occupied, before the law, as unfavorable an attitude as does an accomplice, who, by his testimony, slips the halter from his own neck and places that halter about the neck of another alleged participant in the crime. In that case, the instinct of self-preservation, the first law of nature, relieves, to some extent, the infamy of the degradation, and palliates, in some sense, the baseness of the betrayal. In this case, there is no such alleviating circumstance, nor palliating feature; the motive which prompts is like the reward it seeks, and both are unfathomable in their baseness. The juries are invariably instructed to receive the testimony of an accomplice with great caution, and not to believe him unless corroborated from an independent source to the extent of establishing the guilt of the defendant on trial. Why is this done? Because the testimony comes from

a polluted source. An instruction in regard to the insufficiency of the testimony of an accomplice, when uncorroborated, was refused in *State v. Jones*, 64 Mo. 391, and for this the judgment was reversed. At the present term of this court, in the case of *State v. Chiagk, ante*, p. 395, one of the grounds of reversal was a faulty instruction in regard to an accomplice's testimony. What more polluted source of testimony can be conceived of than the testimony of him who was offered in the case at bar to establish the alleged extra-judicial confession? Although I know of no authority on the point, I am persuaded that the same considerations which require a cautionary instruction to be given in regard to the testimony of an accomplice, require, also, a similar instruction to be given in the present instance, and the duty of giving such instruction is to be regarded in the same light as the duty commented on in the first paragraph of this opinion. On the grounds mentioned, I am for reversing the judgment.

*On motion for rehearing.*

NORTON, C. J.—A motion for rehearing has been filed in this case, and among other reasons assigned for granting the prayer of the motion, it is insisted that the ruling made in the decision rendered, to the effect that the omission or failure of the court, although not requested so to do, to instruct the jury that an extra-judicial confession, unless corroborated by other evidence as to the *corpus delicti*, would not justify nor authorize a conviction, was not reversible error. Is it in conflict with section 1908, Revised Statutes? This section appears for the first time in the revision of 1879 as a new section, and is as follows :

" Section 1908. Order of trial. — The jury being impaneled and sworn, the trial may proceed in the following order : First. The prosecuting attorney must

state the case and offer the evidence in support of the prosecution. Second. The defendant, or his counsel, may then state his defence and offer evidence in support thereof. Third. The parties may then respectively offer rebutting testimony only, unless the court for good reason, in furtherance of justice, permit them to offer evidence upon their original case. Fourth. The court must instruct the jury in writing upon all questions of law arising in the case which are necessary for their information in giving their verdict. Fifth. Unless the case be submitted without argument, the counsel for the prosecution shall make the opening argument, the counsel for the defendant shall follow, and the counsel for the prosecution shall conclude the argument."

This section of our statute was borrowed from an Indiana statute, which was on the statute books of that state, and which had received judicial construction in the case of *Rollins v. The State*, 62 Ind. 46, when it was incorporated in the revision of 1879. The Indiana statute provides (*vide* R. S., Ind. 1881, p. 340) that, "in charging the jury, he, the court, must state to them all matters of law necessary for their information in giving their verdict." It will be seen that the language employed in said section 1908, Revised Statutes, 1879, is identical in substance with the Indiana statute. It is as follows: "The court must instruct the jury upon all questions of law arising in the case which are necessary for their information in giving their verdict."

In further proof that said section 1908 was borrowed from the Indiana statute, it will be found on comparison, which comparison we have made, that the first, second, and third clauses of said section, as well as what precedes those clauses, are *verbatim* copies of the first, second, and third clauses of the Indiana statute, as well as what precedes those clauses in the statute of said state.

In construing this statute it is distinctly held by the

Supreme Court of that state, in the case of *Rollins v. The State, supra,* decided in 1878, that when the instructions given to the jury are right as far as they go, the mere failure of the court to instruct as to other proper matters, is not available as error, where no request to so further instruct is made. The doctrine of this case was reaffirmed in the case of *Adams v. The State,* 65 Ind. 565, decided at the May term, 1879, from which we quote the following: ."The court directed the attention of the jury to the point that, in manslaughter, as well as in murder, there was the 'common element of intent to kill,' but throughout the instructions the jury were never informed that there was, or could be manslaughter without any intention to kill. It is this omission of the court to instruct the jury in regard to a grade of homicide well recognized in and by our law, of which appellant's counsel complains in argument in this court. But it seems to us appellant is in no condition to complain in this court, of the omission of the circuit court to instruct the jury in regard to involuntary manslaughter. No complaint is made by appellant of the instructions given, but the only complaint is that the court omitted an instruction which the appellant claims was applicable to the case, made by the evidence, and ought to have been given. This may be conceded, but before the court could be charged with positive error, on account of its omission to instruct the jury in relation to involuntary manslaughter, it was necessary, we think, that the appellant should have requested of the court such an instruction. If the appellant had requested such an instruction, and if the court had failed or refused to comply with such request, then, but not until then, the appellant could have complained of the omission of the court to instruct the jury in relation to involuntary manslaughter as probably erroneous. The record fails to show that the appellant requested any such instruction, and, therefore, he cannot be heard to complain of the

court's omission to give such an instruction." See, also, *Powers v. State*, 87 Ind. 144, where the question involved is fully and ably discussed, and also case of *Rauck v. State*, 9 West. Rep. 197.

It is a principle so well established as not to require the citation of authorities to support it, that when the legislatures borrow or incorporate in the statutes of this state the statute of another state, which has been judicially construed by the courts of such state, that the construction thus put upon it will be adopted and followed by the courts of this state.

Viewed in the light of what is above said, the point made by counsel that the judgment should be reversed, because of the failure or omission of the trial court to instruct the jury, although no request to that effect was made, that they could not convict upon the extra-judicial confession of defendant alone, but must look for corroboration as to the *corpus delicti* in the other evidence, is not well taken. The other points relied upon in the motion for rehearing, it is unnecessary to notice, further than to say that they were considered in the opinion delivered, and ruled upon adversely to the views of defendant's counsel.

The motion for rehearing is overruled, and in this all the judges concur, except Sherwood, J., who dissents.

SHERWOOD, J., DISSENTING.—I continue to dissent:

I. Hemmed in by the array of authorities I have cited, beginning with 7 Mo., and coming down as late as *State v. Palmer*, 88 Mo. 568, all announcing the duty of the trial court, in criminal causes, to instruct the jury on all the law arising in the case ; confronted, too, by the express mandate of the statute, as contained in section 1908, that "the court must instruct the jury in writing upon all questions of law arising in the case which are necessary for their information in giving their

verdict," my associates abandon their former position, change their base, and attempt to take refuge behind the statute of Indiana, claiming that section 1908 was "borrowed from that state." This is a sheer assumption, as I will now proceed to show: I am informed by Judge Kelley, who was engaged upon the revision of 1879, and to whom we are indebted for many valuable additions to our criminal procedure, that the statute in question was obtained from the state of *Kansas*, and this assertion is sustained by the following quotation from the statutes of that state:

"Sec. 227. The jury, being impaneled and sworn, the trial may proceed in the following order: First. The prosecuting attorney must state the case, and offer the evidence in support of the prosecution. Second. The defendant or his counsel may then state his defence, and offer evidence in support thereof. Third. The parties may then respectively offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, permit them to offer evidence upon their original case. Fourth. The court must charge the jury. Fifth. Unless the case be submitted without argument, the counsel for the state shall make the opening argument, the counsel for the defendant or defendants shall follow, and the counsel for the state shall conclude the argument.

"Sec. 236. The judge must charge the jury, in writing, and the charge shall be filed among the papers of the cause. In charging the jury, he must state to them all matters of law which are necessary for their information in giving their verdict. If he presents the facts of the case, he must inform the jury that they are exclusive judges of all questions of fact." Gen. Stat. Kas. 1868, secs. 227, 236, pp. 856, 858; Comp. Laws Kas. 1879, secs. 4722, 4731.

It will be observed that section 1908, *supra*, of our statute is a *literal transcript* of section 227 of the Kansas statute, except the fourth clause, for which is substituted

section 236, *supra*, modified only to the extent required by our system of practice, and except the substitution, in the fifth clause, of the word "prosecution" for the word "state," and the addition of the words "or defendants." In order to corroborate still further the position I have taken, in reference to the source whence section 1908 is obtained, I here copy section 1823 of the Indiana statute, referred to in⁻ the majority opinion, *but not copied.*

"Sec. 1823. *Order of trial.* The jury being impaneled and sworn, the trial shall proceed in the following order: First. The prosecuting attorney must state the case of the prosecution, and briefly state the evidence by which he expects to support it; and he shall then offer the evidence in support of the prosecution. Second. The defendant, or his counsel, may then state his defence, and offer evidence in support thereof. Third. The parties may then, respectively, offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, permit them to offer evidence upon their original case. Fourth. When the evidence is concluded, the prosecuting attorney and the defendant, or his counsel, may, by agreement, in open court, submit the case to the court or jury trying the same, without argument. But, if the case be not so submitted without argument, the prosecuting attorney shall have the opening and closing of the argument; but he shall disclose, in the opening, all the points relied on in the case; and if, in the closing, he refer to any new point or fact not disclosed in the opening, the defendant, or his counsel, shall have the right of replying thereto, which reply shall close the argument in the case. If the prosecuting attorney shall refuse to open the argument, the defendant, or his counsel, may then argue the case. If the defendant or his counsel refuse to argue the case, after the prosecuting attorney has made his opening argument, that shall be the only argument allowed in the case.

Fifth. The court must then charge the jury ; which charge, upon the request of the prosecuting attorney, the defendant, or his counsel, made at any time before the commencement of the argument, shall be in writing, and the instructions therein contained, numbered and signed by the court.   In charging the jury he must state to them all matters of law which are necessary for their information in giving their verdict.   If he present the facts of the case, he must inform the jury that they are the exclusive judges of all questions of fact, and that they have a right also to determine the law.   *Sixth.   If the prosecuting attorney, the defendant, or his counsel, desire special instructions to be given to the jury, such instructions shall be reduced to writing, numbered and signed by the party, or his attorney, asking them, and delivered to the court, before the commencement of the argument.   Such charge or charges of the court, or any special instructions, when so written and given by the court, shall in no case be orally qualified, modified, or in any manner orally explained to the jury by the court.*   " Section 1823, R. S. Ind. 1881, pp. 340, 341.

By making comparison of these sections, it will be further observed that the *first* clause of section 1908 is *not* a *verbatim* copy of the *first* clause of the Indiana statute.    Let the respective statutes speak for themselves.  I have italicized the sixth clause of section 1823, *supra*, no reference to which has been made in the opinion of the majority ; and I desire to call special attention to it, as *this clause* is what creates the essential and striking difference between the statute of Indiana, and the Kansas statute, and our own.   And the Indiana statute, as above quoted, is, in substance, the same as it was when the case of *Rollins v. State*, 62 Ind. 46, was decided.   This is shown by the case of *Powers v. State*, 87 Ind. 144, *loc. cit.* 153, cited by the majority, so that, as the rulings of the Indiana courts, on which reliance is based by this court, were rulings made on the sixth

clause of section 1823, a clause entirely omitted from the Kansas statute and from our own, it must needs follow that such rulings should have no weight in determining what our statute, section 1908, means. Our statute, with that sixth clause purposely omitted, when compared with the Indiana statute, is like the play of Hamlet with the part of Hamlet left out! And it is to be still further observed that the statutory regulations in Indiana in regard to instructions are the same in *civil* as in criminal cases. R. S. Ind. 1881, sec. 533; R. S. Ind. 1876, sec. 324. For this reason it is that the Supreme Court of Indiana, when stating that a party who desires special instructions must ask them, refer indiscriminately to both *civil and criminal* cases. *Powers v. State, supra,* and cas. cit.

And, in further proof that section 1908 was adopted from the statutes of Kansas, and with the judicial rulings of that state as part and parcel thereof, I cite the case of *Craft v. State,* 3 Kas. 450, where the Supreme Court, in passing upon that provision of their criminal code, that the court in charging the jury "must state to them all the matters of law necessary for their information in giving their verdict," said: "As the provision is plainly imperative, there is no necessity of attempting to sustain it by reason. It was error to omit to do so." This ruling was made in 1866, long before the ruling made in *Rollins v. State, supra,* which was not made until May, 1878, and it is scarcely probable that case was published in time for the legislature of this state to be apprised of it in the winter of 1879.

But, for the purposes of this argument, I may freely grant that our section 1908 was indeed borrowed from the Indiana statute, and still this concession will not support the ruling of the majority; on the contrary, the adoption of the Indiana statute, with the significant omission of the sixth clause of section 1823, which corresponds with the sixth clause of section 103, of the re-

vision of 1876, of that state, is equivalent, on the part of our legislature, to an *absolute rejection* by them of that sixth clause and all judicial rulings based upon it. There is no escape from this conclusion. Besides all that, the opinion of the majority on this motion for rehearing omits all mention—entirely ignores—section 1920, of our statute, which still remains in full force, and on which I have already commented. That section alone, if my construction of it is correct, should have compelled a reversal of the judgment; and this *a fortiori* must be the case where the provisions of that section have been reinforced and so strongly and conspicuously emphasized by the mandatory provisions of section 1908.

*Before* we had a statute on the subject in this state, it was declared to be "the duty of the judge of a criminal court to instruct the jury on all the law arising in the case." *Hardy v. State*, 7 Mo. 608. *But now*, where we have *two* sections of the statute requiring that duty to be performed, as well as many decisions of this court to the same effect, such duty is abolished, unless brought into being and existence by a request that such duty be performed! The result of all which is, that a clause in an Indiana statute, which we have *not* adopted, is to have the same force and effect as if it *had been adopted*, the result of all of which is that such *unadopted statute* is to destroy, overthrow, and annul a statute which we *do adopt*, as well as over-ride a long line of decisions; the result of all of which is that, hereafter, in a criminal cause, a judge of a trial court (guided by the precedent here furnished), unless otherwise requested, may sit like a sphinx while the issues of life and death are being passed on before him, and may let the jury "guess at the law." *State v. Stonum*, 62 Mo. 596. Such a ruling shall never receive my sanction; it flies into the face of long-established precedent, nullifies a plainly-worded mandatory statute, and defeats the ends of public jus-

tice, which require a fair and impartial trial, something unattainable except the jury be properly and fully instructed upon the whole law of the case.

II. In a former dissenting opinion I spoke of the testimony of Dingfelder, the assumed name of the detective, Jno. F. McCullough, who testified as to extrajudicial confessions made by the defendant, while the detective was in jail with him. In that opinion, I held that the testimony of the detective should not have gone to the jury without a cautionary instruction as to the credibility to be attached to it, similar to an instruction in relation to the testimony of an accomplice, but upon more mature reflection, I am satisfied that I should have taken a more advanced position. The detective, by a previous arrangement and concert of action between the circuit attorney Clover, the assistant circuit attorney McDonald, and Furlong, forged the name of Morris to a check, was arrested per agreement on a warrant duly issued; indicted for the forgery on testimony which was really false, but believed by the witnesses to be true, and cast into jail where he obtained the alleged confession from the defendant. I hold now, that such a confession, so obtained by such means, should be *altogether rejected.* Such a course on the part of the sworn officers of the law cannot be denounced in terms too strong. It was a prostitution of the process of the court; it was a corrupting of the very fountain head of justice; and the pure administration of the law, and public policy, imperatively demand that evidence so procured should be spurned with infinite loathing whenever offered. It is true that the opinion of the majority condemns, "as gently as any sucking dove," the method of obtaining the alleged confession, but at the same time accepts the fruits of the nefarious work. This is condemnation in *theory,* but approval in *practice.*

III. I was content, on a former occasion, to confine my dissent to the above points, believing them amply

sufficient for a reversal; but now, before concluding, I deem it proper to notice some other points. Counsel for the state had stated to the jury in argument that the depositions taken in England as to the defendant's good character, "*did not amount to anything*," by reason of their negative character, and counsel for the defendant, in his argument in reply, in order to meet this statement, and to correct the erroneous impression made by it upon the jury, attempted to read from *State v. Grate*, 68 Mo. 22, where the doctrine is fully announced by this court that a witness who is well acquainted with the character of a person, and lives in his neighborhood will be allowed to testify to the general reputation of such person, although he has never heard it discussed; such negative evidence being regarded as evidence of the highest nature in favor of good character. But the trial court refused to permit that case to be read to the jury. Thereupon, counsel for defendant asked permission of the court to state the law correctly to the jury, and this was also denied.

There can be no doubt of the correctness of the ruling of the trial court as to its refusal to permit the authority mentioned to be read to the jury; and in so far as this point is concerned, the opinion of the majority is correct, but in that opinion no notice whatever is taken of the request of counsel for defendant to be permitted to state the law correctly to the jury. This case, resting as it did upon circumstantial evidence alone, except the alleged extra-judicial confession already commented on, it was of the highest importance to the defendant to establish a good character; this had been done by the depositions in question; but under the statement of the counsel for the state that those depositions "*did not amount to anything*," and under the refusal of the court to permit counsel for the defendant to correct and contradict this false and damaging statement, made by counsel for the state, it went to the jury as the law on

the point accompanied by the sanction of the trial court. *State v. Rothschild*, 68 Mo. 52 ; *State v. Jaeger*, 66 Mo. 173 ; *State v. Martin*, 74 Mo. 547.

In *State v. Mahly*, 68 Mo. 315, the prosecuting attorney said to the jury : " ' Mahly was on the stand, why did he not tell us how the child was burned ? It was incumbent on him to show how these things were. Did he tell us how she was hurt ? It was incumbent on him to prove how she was hurt. The defendant was there, master of his own house, and it was incumbent on him to show that he did not inflict the burns.' Again he said to the jury in that closing argument : ' The preponderance of testimony was in favor of conviction and against the defendant, and upon such evidence they (the jury) must convict.' Every one of these declarations was a gross misrepresentation of the law, and such conduct on the part of the prosecuting attorney has so often been condemned by this court, that the hope was indulged that the admonitions given would be heeded. It is not for prosecuting attorneys to declare the law to the jury. That is the duty of the court, and the state's attorney is as much bound by the law, as declared by the court, as are the jury and the accused. The court declared the law, but the prosecuting attorney, not satisfied with the instructions given by the court, made declarations of law to the jury in conflict with those given by the court, and manifestly and palpably erroneous. Can we say that the prisoner was not prejudiced by this conduct of the state's attorney ? If he knew the law and made these declarations to the jury in order to procure a conviction, his conduct was very reprehensible. If he knew no better he should have accepted the law as given by the court. Persons accused of crime must be fairly tried, and when so tried, we shall not interfere to prevent them from being punished ; but it is not only

the duty of this court; but of every officer of the state who has duties to perform in regard to the trial of persons accused of crimes, to see that they have a fair and impartial trial. The circuit court should have rebuked the prosecuting attorney and told the jury that the law was not as the attorney declared it to be, and for not having done so, the judgment should be reversed."

In *State v. Kring*, 64 Mo. 591, the circuit attorney made the following remarks: "If you wrong the accused, by finding him guilty, that wrong can be righted, because there are two courts above this, in which the accused can have this reversed; the court of appeals and the Supreme Court. If you are not justified in finding this man guilty, it is in their power to rectify any error; while if, on the other hand, you turn the murderer loose in the community, no matter how frail might be the foundation on which you do it, and how frail may be the scaffolding, it takes him forever in the light of freedom again; you will make a wound in this community that will never be healed." This court said: "The statement that the higher courts referred to had the power to review the finding of the jury on the weight of evidence was calculated to induce the jury to disregard their responsibility. * * * The judge presiding at the trial, in our opinion, should not have permitted such remarks to be made, on the close of the argument, without a prompt correction. * * * The circuit attorney represents the state, and it is presumable that the state has no wish to convict or punish an innocent man. He is employed to see that the laws against criminals are enforced, but he is not required to avail himself of his privilege of concluding the argument before the jury, to state propositions of law which are clearly untenable, with a view to influence the jury in their verdict."

In *State v. Lee*, 66 Mo. 165, the prosecuting attor-

ney had indulged in improper remarks as to the defendant's good character, and lack of proof of it, and this court said: "The court should not have permitted the remarks of the attorney to pass, without a rebuke, which would have taken from them their sting. A proper rebuke would probably have cured the error. Such conduct of a prosecuting attorney was condemned in the case of *State v. Kring*, 64 Mo. 591, and will be as often as it is properly brought to the notice of this court. It should not be tolerated in civil proceedings, and will not be in criminal cases."

In *State v. Reed*, 71 Mo. 200, Norton, J., said: "The court gave no instruction in regard to the legal effect of defendant's possession of the hog, soon after it was stolen, if it was, in fact, stolen, which the evidence of the owner of it left in doubt, but the jury were allowed to grope in the dark upon that subject. In the closing argument, the prosecuting attorney, against the objection of defendant, undertook to supply the omission made by the court, and argued to the jury as to the presumption of guilt and inferences to be drawn therefrom when property was stolen and found in the possession of a person soon after the 'supposed theft.' The court having abdicated its duty in failing to instruct the jury as to what effect was to be given to the fact proved, that defendant was in possession of the hog alleged to have been stolen, should at the least have forbidden the prosecuting attorney, who, in his closing argument, assumed the duty thus omitted, from making any statement calculated to mislead the jury as to the law governing that question. We think his remarks were of that character, and from the use by him of the words, 'supposed theft,' the jury might well have concluded that it was not incumbent on the state to prove the *corpus delicti*, or the fact that the hog was stolen, but that it was only necessary for the state to offer evidence sufficient to justify a suspicion that the hog had been stolen,

and that the possession of property supposed to have been stolen would authorize a conviction." And the judgment was reversed.

The case just cited is directly in point, as to a trial court abdicating its duty in failing to rebuke a prosecuting attorney when misleading a jury, as to the law, and is also directly in point as to a similar abdication of duty on the part of the trial court, where it leaves the jury to "grope in the dark" in regard to the legal effect of certain evidence, by failing to instruct them on the whole law of the case; thus fully affirming the position taken by me in my original dissenting opinion, as to the evil influence of "partial, half-way instructions."

IV. There was another element of error in the refusal of the trial court to permit counsel for defendant to state the law correctly, as to what constituted evidence of good character, in order to combat the false statement, as to the law on that point, made by opposing counsel, because this course, on the part of the trial court, was, *pro tanto*, a denial of the constitutional right of the defendant to be heard by counsel. It is quite obvious that if a trial court may thus invade the province of a defendant's counsel, and compel him to be dumb in the face of a false statement of the law, in one particular, it may do it in all, and thus obliterate the right in question.

V. There was error committed by the trial court in allowing the defendant to be cross-examined on subjects not even remotely referred to, in his examination in chief, not only on immaterial matters, but matters which had a tendency to show him guilty of other crimes, and thus to prejudice the jury against him. Evidence of specific acts, as is well known, can never be received when good character is the question being discussed. *State v. Bulla*, 89 Mo. 595. And yet, by cross-examination of the defendant, the state was allowed to introduce evidence before the jury which was utterly incompetent, if

offered on the part of any other witness or in any other form. *State v. Hart*, 66 Mo. 208; *State v. Martin*, 74 Mo. 547; *State v. Bulla, supra.* Under the provisions of the act of 1877, a defendant who took the stand as a witness, could be cross-examined as any other witness. *State v. Clinton*, 67 Mo. 380; *State v. Cox*, 69 Mo. 392; *State v. Rugan*, 68 Mo. 214; *State v. Testerman*, 68 Mo. 408. But since those rulings were made, the legislature, by section 1918 (R. S. 1879), so amended the law as to confine the cross-examination of a defendant witness, "as to any matter referred to in his examination in chief." This amendatory clause has been frequently ruled upon by this court, and when its behests have been disobeyed, a reversal of the judgment has been the invariable result. *State v. McGraw*, 74 Mo. 573; *State v. Turner*, 76 Mo. 350; *State v. McLaughlin*, 76 Mo. 324; *State v. Porter*, 75 Mo. 171; *State v. Douglass*, 81 Mo. 231; *State v. Patterson*, 88 Mo. 88; *State v. Chamberlain*, 89 Mo. 129. The result of the opinion of the majority is to repeal the statute as it now stands, and to restore and reënact the law of 1877.

VI. The circuit attorney, as shown by an uncontradicted affidavit filed in the cause (*State v. Johnson*, 76 Mo. 121), in order to prevent a continuance of the cause on the part of the defendant, had agreed with defendant's counsel that he would waive any informality as to the depositions being improperly certified, which established the good character of the defendant, and upon this waiver and agreement, the defendant announced ready for trial. But yet, the circuit attorney, in his closing argument, was permitted, over repeated objections of defendant's counsel, to belittle those very depositions; to state that they were returned without a certificate, were not worth the paper they were written on, were utterly valueless, etc., etc., and were only read as a favor, by his permission. Having made the agreement mentioned, and having permitted the depositions to be read, without

objection, common fairness required that his lips should be sealed as to any invalidity of the depositions on account of lack of certification. Conduct similar to this, on the part of a prosecuting attorney, was pointedly condemned by Norton, J., as "such a departure from legitimate argument and fair dealing as to justify a reversal of the judgment." *State v. Barham*, 82 Mo. 67.

VII. I have not the time, nor would it serve any useful purpose, that I make any further comments on this record. I am free to say, however, that, long as I have been on this bench, I have never examined the record in any case, civil or criminal, where the rights of a defendant to a fair and impartial trial have been so frequently and so flagrantly disregarded by a trial court, as in the present instance. The points I have commented on may be considered as but types of numerous other errors, of which I make no mention.